UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
====================================X
BERNARD CARL, Civil Action No.:

Plaintiff,

vs. **COMPLAINT**

RICHARD EDWARDS, JOHN HAWKINS,
SPECIALIST CARS OF MALTON LIMITED,
GRAEME SCHOLES, LEFT HAND DRIVE LTD.,
PAUL SWEENEY, PHS CONSULTANTS,
ANDREW HOWARTH, CHRISTOPHER WILLIAMS,
TREVOR SMITH, FOOS CHINA TRADING,
VIKASH LIMBANI, LANDMARK CAR CO.,
JEFFREY PATTINSON, THOMAS HAMANN,
and JOHN DOES 1-5,

Defendants.
====================================X

The Plaintiff, BERNARD CARL, by and through his attorneys, the Law Offices of Kravis, File and Wurgaft, P.C., as and for a complaint against the Defendants, does hereby allege, upon information and belief, as follows:

## INTRODUCTION

1. Over the course of the past three years, Defendant, Richard Edwards, his co-defendants and co-conspirators have sought to deceive, defraud, and otherwise tortuously injure Plaintiff, Bernard Carl, by means of a plan that was premeditated, carefully conceived and substantially executed. The resulting fraud, reaching across multiple international borders, ultimately had a material impact in the United States and directly affected and caused damage to a United States citizen.

2. The Defendants' conduct violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et. sq., with predicate acts of deception, money laundering, mail fraud, wire fraud, transportation of stolen goods, transportation of stolen vehicles, and interstate and foreign travel in aid of a racketeering enterprise, among others. In addition, Defendants' conduct constitutes common-law fraud, unjust enrichment, trespass to chattels and civil conspiracy, among others. As a result, Defendants' misconduct entitles Plaintiff to damages and any other relief the court finds just and equitable.

**THE PARTIES**

3. That at all times herein mentioned, the Plaintiff, BERNARD CARL ("Plaintiff"), is an individual with residences at 216 Coopers Neck Lane, Southampton, New York and 2340 Wyoming Avenue NW, Washington, DC.

4. That at all times herein mentioned, Plaintiff is an avid collector of vintage sports and racing automobiles.

5. That at all times herein mentioned, Plaintiff has occasionally engaged in the purchase of such aforementioned automobiles for investment and/or resale purposes.

6. That at all times herein mentioned, Plaintiff has never invested in a partnership or participated in a co-ownership arrangement with regard to the purchase and/or sale of vintage automobiles.

7. That at all times herein mentioned, Plaintiff is the victim of the criminal conspiracy hereinafter described.

8. The Defendants listed in paragraphs 9 through 42 are the individuals and entities who have conspired to engage in a pattern of racketeering activity, have each committed numerous

criminal acts and/or aided and abetted in the commission of such criminal acts as part of their scheme to defraud Plaintiff and have each participated in the operation or management of the criminal enterprise.

9. That at all times herein mentioned, the Defendant, RICHARD EDWARDS ("EDWARDS"), is a vintage automobile broker residing at Fulford House on the Green at Culworth, Banbury OX17 2BB, Oxfordshire, United Kingdom.

10. That, in recent years, Defendant, EDWARDS, has been accused, in both civil and criminal proceedings, of fraud in connection with his trading in vintage cars.

11. That, in recent years, Defendant, EDWARDS, has also been accused of committing fraud in connection with vintage cars by other victims, including but not limited to individuals, Rob Gray, John Broadhurst, Ronald Bauer and William Lock.

12. That at all times herein mentioned, Defendant, SPECIALIST CARS OF MALTON LTD. ("SPECIALIST CARS"), is a private limited company, registered under the laws of Great Britain.

13. That at all times herein mentioned, Defendant, SPECIALIST CARS, maintains its primary business location at 22 York Road Business Park, Malton, North Yorkshire, United Kingdom.

14. That at all times herein mentioned, Defendant, SPECIALIST CARS, is an automobile dealership engaged in the sale of vintage, sports and racing vehicles.

15. That at all times herein mentioned, the Defendant, JOHN HAWKINS ("HAWKINS"), is the managing director of Defendant, SPECIALIST CARS, and maintains a primary residence at 70A Middle Cave Road, Malton, North Yorkshire Y017 7NE, United Kingdom.

16. That at all times herein mentioned, Defendant, GRAEME SCHOLES ("SCHOLES"), is an automobile broker residing at Brick Kiln Cottage, The Avenue, Harriard, Basingstroke, Hampshire, UK RG25 2PR.

17. That at all times herein mentioned, Defendant, SCHOLES, conducts business under the name, LEFT HAND DRIVE LTD. ("LEFT HAND"), located at Basement Car Park, 1-4 Bethune Road, London, United Kingdom.

18. That at all times herein mentioned, Defendant, SCHOLES, owns, operates, and/or controls Defendant, LEFT HAND.

19. That at all times herein mentioned, Defendant, LEFT HAND, acted as an alter ego for Defendant, SCHOLES.

20. That at all times herein mentioned, Defendant, PAUL SWEENEY ("SWEENEY"), is a vintage automobile dealer located at Vine Cottage, Oakum Lane, Staverton, Daventry, Northants NN11 6JQ, United Kingdom.

21. That at all times herein mentioned, Defendant, SWEENEY, conducts business under the name, PHS Consultants ("PHS"), with an address of Vine Cottage, Oakum Lane, Staverton, Daventry, Northants NN11 6JQ, United Kingdom.

22. That at all times herein mentioned, Defendant, SWEENEY, owns, operates, and/or controls Defendant, PHS.

23. That at all times herein mentioned, Defendant, PHS, acted as an alter ego for Defendant, SWEENEY.

24. That at all times herein mentioned, Defendant, ANDREW HOWARTH ("HOWARTH"), is a vintage automobile dealer residing at Brownslow Cottage, Budworth Lane, Great Budworth, Cheshire, United Kingdom.

25. That at all times herein mentioned, Defendant, HOWARTH, conducts his business at Thellow Heath Farm, Cheshire, United Kingdom.

26. That at all times herein mentioned, Defendant, CHRISTOPHER WILLIAMS ("WILLIAMS"), is a vintage automobile dealer residing at Middle Farm, Stanley Pontlarge, Cheltenham, Gloucestershire, United Kingdom.

27. That at all times herein mentioned, Defendant, WILLIAMS, conducts business as Global, located at Middle Farm, Stanley Pontlarge, Cheltenham, Gloucestershire, United Kingdom.

28. Defendant, WILLIAMS, has previously been accused of participating, as a co-conspirator, in one or more fraudulent schemes with Defendant, EDWARDS.

29. That at all times herein mentioned, Defendant, TREVOR SMITH ("SMITH"), has been publicly described by Defendant, EDWARDS, as a known figure in the London "underworld".

30. Defendant, SMITH, has previously been accused of involvement in one or more of Defendant, EDWARDS', fraudulent schemes.

31. That at all times herein mentioned, Defendant, FOOS CHINA TRADING ("FOOS"), is an entity licensed to conduct business in Hong Kong.

32. That at all times herein mentioned, Defendant, VIKASH LIMBANI ("LIMBANI") is an individual operating in the automobile trade.

33. That at all times herein mentioned, Defendant, LIMBANI, resides at 118 Bridgewater Road, Alperton, HAO 1AP, United Kingdom.

34. That at all times herein mentioned, Defendant, LANDMARK CAR CO. (“LANDMARK CAR”), is a vintage automobile dealership registered under the laws of Great Britain.

35. That at all times herein mentioned, Defendant, LANDMARK CAR, maintains a primary business location at Hogarth Roundabout, 109 Devonshire Road, Chiswick, London W4 2AN, United Kingdom.

36. That at all times herein mentioned, Defendant, JEFFREY PATTINSON (“PATTINSON”), is an individual residing at 130 Shaftsbury Avenue, London W1D 5AR.

37. That at all times herein mentioned, Defendant, PATTINSON, is the managing director of Defendant, LANDMARK CAR.

38. That at all times herein mentioned, Defendant, THOMAS HAMANN ("HAMANN"), is a vintage car dealer residing at 66 Knobloch Ln., Stamford, Connecticut 06902.

39. That at all times herein mentioned Defendant, HAMANN, sold vintage cars as “Hamann Classic Cars” doing business from 66 Knobloch Ln., Stamford, Connecticut 06902.

40. That at all times herein mentioned, Defendant, JOHN DOE 1 ("DOE 1"), is a South African-based vintage car buyer described by Defendant, EDWARDS, as being in the "sex trade."

41. On information and belief, Defendant, DOE 1, was engaged in buying vintage and collector cars, at least in part, to launder money realized through its activities in the "sex trade,” gambling and other illegal businesses.

42. That at all times herein mentioned, Defendants, JOHN DOES 1-5, are as yet unidentified co-conspirators of the above-referenced Defendants.

## JURISDICTION and VENUE

43. This action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 2314 (transportation of stolen goods in interstate or foreign commerce), 18 U.S.C. § 2312 (transportation of stolen vehicles), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1952 (foreign travel or transportation in aid of racketeering enterprise), and 18 U.S.C. § 659 (theft from interstate shipments), as well as various New York state laws. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).
44. The parties are completely diverse and the matter in controversy exceeds $75,000.00.
45. Defendant, EDWARDS, is the central figure in the fraudulent scheme described herein and has visited the Plaintiff in the State of New York on several occasions (including, but not limited to, on or about June 2014 and May 2015) to further the fraudulent scheme and to conduct the business of the criminal enterprise described herein.
46. Defendant, EDWARDS, visited Plaintiff on Amelia Island, located within the State of Florida, on at least one (1) occasion (on or about March 2015) to solicit funds from Plaintiff and otherwise to conduct the business of the criminal enterprise as described herein.
47. Furthermore, Defendant, EDWARDS, has visited the United States in connection with his dealings with Plaintiff on at least one (1) other occasion in the course of perpetrating the alleged fraud on behalf of the criminal enterprise described herein.

48. Defendant, EDWARDS, has perpetrated the fraudulent scheme as described herein through the use of numerous email correspondences sent to Plaintiff at his home in the United States.

49. Defendant, EDWARDS, has initiated numerous telephone calls to Plaintiff at his home in the United States in furtherance of the criminal scheme perpetrated by the criminal enterprise described herein.

50. In addition, Defendant, EDWARDS, solicited funds from Plaintiff in the United States on numerous occasions in the course of executing the conspiracy to defraud Plaintiff as described herein.

51. Defendant, EDWARDS, has continuously conducted his vintage car business in the United States.

52. Defendant, EDWARDS, has previously availed himself of the United States Federal Courts in connection with his cross-border vintage car business.

53. As recently as January 2016, Defendant, EDWARDS, offered to sell one or more of the vehicles that form the subject of the instant litigation to buyers in the United States.

54. Defendant, EDWARDS, has repeatedly attempted to surreptitiously sell the automobiles, which form the basis of this action, through dealers located within the United States, including to Defendant, HAMANN, in the State of Connecticut and vintage automobile dealer, Bruce Canepa, located in California.

55. At the request and direction of Defendant, EDWARDS, much of the money Plaintiff paid to purchase the Missing Cars, which form the basis of this litigation, was wired from Plaintiff's United States bank accounts.

56. Defendant, HAWKINS, on behalf of Defendant, SPECIALIST CARS, sent numerous email correspondences to Plaintiff at his home in the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

57. Defendant, HAWKINS, has sent numerous email correspondences to Plaintiff at his home in the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

58. Defendant, HAWKINS, has also initiated telephone calls to Plaintiff at his home in the United States to solicit funds and further the conspiracy to defraud Plaintiff as described herein.

59. Defendant, HAWKINS, was present within the United States and conducted negotiations with Plaintiff from within the United States during one (1) or more critical times during the conspiracy to defraud Plaintiff as described herein.

60. Defendant, HAWKINS, communicated with Plaintiff in furtherance of the conspiracy to defraud Plaintiff, while Defendant, HAWKINS, was present in the United States.

61. Defendant, SCHOLES, sent multiple email correspondence to Plaintiff at his home in the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

62. Defendant, SCHOLES, solicited funds from Plaintiff within the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

63. Defendant, SCHOLES, received funds from Plaintiff in the United States in the course of the conspiracy to defraud Plaintiff as described herein.

64. Defendant, SWEENEY, sent multiple email correspondence to Plaintiff at his home in the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

65. Defendant, SWEENEY, solicited funds from Plaintiff within the United States in the course of his participation in the conspiracy to defraud Plaintiff as described herein.

66. Defendant, SWEENEY, received funds from Plaintiff in the United States in the course of the conspiracy to defraud Plaintiff as described herein.

67. Defendant, HOWARTH, sent multiple email correspondence to Plaintiff at his home in the United States in order to further a cover-up of the conspiracy to defraud Plaintiff as described herein.

68. Defendant, WILLIAMS, arranged for forged documents to be sent to Plaintiff at his home in the United States in furtherance of the conspiracy to defraud Plaintiff as described herein.

69. Defendant, LIMBANI, assisted Defendant, EDWARDS, in the unauthorized removal and transport of the cars belonging to Plaintiff, in hiding the whereabouts of those cars from Plaintiff and in attempting to effect the unauthorized sale of those cars to third parties, all the while hiding his conduct from the Plaintiff in the United States.

70. Defendant, LANDMARK CARS, regularly seeks customers for its vintage car offerings in the United States market.

71. Defendant, LANDMARK CARS, directs its marketing and advertising content for its vintage car offerings to the United States market.

72. Defendant, PATTINSON, sent one (1) or more false and misleading email correspondences to Plaintiff at his home in the United States in furtherance of the cover-up of the conspiracy to defraud Plaintiff as described herein.

73. Defendant, PATTINSON, as general manager of Defendant, LANDMARK CAR, regularly deals with customers throughout the United States, including Plaintiff.

74. Defendant, HAMANN, is a resident of and conducts business in Stamford, Connecticut.

75. Plaintiff has suffered significant harm in this District as a direct result of Defendants' wrongful conduct. Defendants' fraudulent solicitation and conversion of Plaintiff's funds along with the subsequent cover-up scheme to evade detection by Plaintiff occurred in this District. Plaintiff, who maintains a residence and conducts his vintage automobile collecting activities within this District, has already suffered considerable pecuniary damages, including damage to his monetary position, reputation in the vintage automobile collecting community and his ability to meet his current financial obligations.

76. Venue is proper pursuant to 28 U.S.C. § 1391(b).

**FACTS COMMON TO ALL COUNTS**

77. This matter involves several vintage automobiles that Plaintiff was pursuaded to purchase by Defendant, EDWARDS, with the participation and assistance of certain of his co-conspirators.

78. In the Fall of 2013, Defendant, EDWARDS, proposed acting as finder to assist Plaintiff in locating high-value vintage cars that Plaintiff might be interested in purchasing for investment and/or resale purposes.

79. Defendant, EDWARDS, proposed that Plaintiff compensate him by providing a brokerage fee tied to whatever value Defendant, EDWARDS, was able to create for Plaintiff in the purchase and potential resale of said automobiles.

80. By the Fall of 2013, Plaintiff had become aware that Defendant, EDWARDS, was an undischarged bankrupt and as a result, made it clear to Defendant, EDWARDS, that Plaintiff, under no circumstances, desired to become a co-investor, co-owner or partner with

Defendant, EDWARDS, in any venture, as Plaintiff did not want any assets to become tied up in Defendant, EDWARDS', bankruptcy proceedings.

81. Subsequently, Plaintiff agreed to retain Defendant, EDWARDS', services as a broker and sales agent on a non-exclusive, fee-for-service basis, with a fee tied to the profitability of cars cars Defendant, EDWARDS, brought to Plaintiff's attention.

82. On or about November 13, 2013, Plaintiff entered into a certain non-exclusive Fee-For-Service Brokerage Agreement (hereinafter referred to as the "Agreement") with Defendant, EDWARDS. See "Exhibit A."

83. The Agreement between Plaintiff and Defendant, EDWARDS, provided that, "any vehicle bought with [Plaintiff] Carl's funds shall remain the sole and exclusive property of [Plaintiff] Carl until sold and paid for…" See "Exhibit A"

84. The Agreement further provided that, "Edwards may represent the car to potential buyers but must do so as a broker and not as an owner or someone with the authority to commit the car to a potential buyer." See "Exhibit A."

85. The Agreement went on to provide that, while Defendant, EDWARDS, could propose a sale to a potential buyer to Plaintiff for approval, Defendant, EDWARDS, "cannot accept [any such] offers … on [Plaintiff's] behalf," and that any agreement to sell one of the cars not executed by Plaintiff "would not be binding upon [Plaintiff]." See "Exhibit A."

86. The Agreement further provided that, if a car subject to the Agreement were not sold within 90 days after its acquisition by Plaintiff (or such later date as Plaintiff might approve), any right Defendant, EDWARDS, might have had to represent the car to potential buyers would

terminate, and Plaintiff would owe no further obligation to Defendant, EDWARDS, or any party claiming through Defendant, EDWARDS, with regard to that car. See "Exhibit A."

87. Furthermore, the Agreement between Plaintiff and Defendant, EDWARDS, provided that a car subject to the Agreement "may not be released by [any] holder until [Plaintiff] Carl has given a written acknowledgment, confirmed by a telephone call from the holder to [Plaintiff] Carl, [that] the [Plaintiff] Carl has received payment for the car or upon [Plaintiff] Carl's specific written instructions, also confirmed by a telephone call from the holder to [Plaintiff] Carl." See "Exhibit A."

88. Since Defendant, EDWARDS, was acting solely as Plaintiff's broker, Defendant, EDWARDS, did not make any contribution towards the purchase price of any cars Defendant, EDWARDS, located for or recommended to Plaintiff.

89. Additionally, the Agreement contained a provision, whereby Plaintiff would give Defendant, EDWARDS, a reasonable brokerage commission for any cars he located on Plaintiff's behalf, but which Plaintiff decided to retain for his own personal use, rather than offer for re-sale.

90. Defendant, EDWARDS, verbally agreed to the terms of the Agreement.

91. Defendant, EDWARDS, ratified his acceptance of said Agreement by continuing to conduct business with Plaintiff after Plaintiff had expressly represented that Plaintiff would only conduct business with Defendant, EDWARDS, pursuant to the Agreement's terms.

92. Plaintiff relied upon the terms of the Agreement when purchasing the automobiles that are the subject of the instant suit.

93. Defendant, EDWARDS, possessed no ownership rights in any of the cars purchased pursuant to the Agreement.

94. Between November 2013 and November 2014, Plaintiff purchased approximately seventeen (17) vintage automobiles on the recommendation of Defendant, EDWARDS, in reliance upon the terms contained in said Agreement.

95. Eight (8) of the aforementioned automobiles purchased on the recommendation of Defendant, EDWARDS, (hereinafter referred to as the "Missing Cars")and which are among the subjects of this litigation include:

a. Ferrari F40 - Red - s/n ZFFG 34B 0000 80707 (hereinafter "Ferrari F40");

b. Porsche 2.7RS Touring - White - s/n 3601303 (hereinafter "Porsche Touring-White");

c. Lamborghini Miura - Orange - s/n 3925 (hereinafter "Miura");

d. Porsche 2.7RS Lightweight - White - s/n 3600878 (hereinafter "Porsche Lightweight");

e. Porsche 2.7RS Touring - Orange - s/n 3600708 (hereinafter "Porsche Touring-Orange");

f. Porsche 959 Komfort - Black - s/n HS900106 (hereinafter "Porsche 959");

g. Ferrari 365 GT 2+2 - Red - s/n 13167 (hereinafter "Ferrari 365"); and

h. Alfa Romeo Montreal - Red - s/n 142762 (hereinafter "Montreal").

96. Being aware of Defendant, EDWARDS', bankruptcy history, Plaintiff insisted that the automobiles Plaintiff purchased on Defendant, EDWARDS', recommendation be kept at an established vintage car dealership until they were eventually resold.

97. Beginning in March 2014, several of the aforementioned automobiles, including the Missing Cars, purchased by Plaintiff, went to Defendant, SPECIALIST CARS, to be held for the benefit of Plaintiff..

98. Plaintiff relied heavily on Defendants, HAWKINS and SPECIALIST CARS, to provide the necessary insurance coverage and to protect Plaintiff's investment in the automobiles, including the Missing Cars, left in their care.

99. Defendants, HAWKINS and SPECIALIST CARS, have represented that none of the aforementioned eight (8) Missing Cars had been sold as of October 12, 2015.

100. Defendant, EDWARDS, has represented that each of the aforementioned eight (8) Missing Cars were present at the premises maintained by Defendant, SPECIALIST CARS, on October 12, 2015.

101. Defendant, HAWKINS, has represented that each of the aforementioned eight (8) Missing Cars were present at the premises maintained by Defendant, SPECIALIST CARS, on October 12, 2015.

102. Defendant, SPECIALIST CARS, has represented that each of the aforementioned eight (8) Missing Cars were present at the premises maintained by Defendant, SPECIALIST CARS, on October 12, 2015.

103. A hearing before the High Court in the United Kingdom had been scheduled for October 13, 2015, whereby the Court was expected to and did, in fact, order the turnover of all of the aforementioned eight (8) Missing Cars to Plaintiff.

104. On October 12, 2015, Defendant, HAWKINS, advised Plaintiff and the High Court that Defendant, EDWARDS, had removed the aforementioned eight (8) Missing Cars from the premises maintained by Defendant, SPECIALIST CARS, sometime during the evening hours of October 12, 2015.

105.Defendant, EDWARDS', alleged removal of the aforementioned eight (8) Missing Cars from the premises maintained by Defendant, SPECIALIST CARS, occurred less than twenty-four (24) hours before the aforementioned eight (8) Missing Cars were ordered to be turned-over to Plaintiff by the High Court.

106. Defendant, HAWKINS, has stated that on the evening of October 12, 2015, Defendant, EDWARDS, came to the premises of Defendant, SPECIALIST CARS, with a large transport vehicle, a group of hefty individuals and forcibly removed the eight (8) Missing Cars.

107. Defendant, HAWKINS, failed to notify the police or file a report with the authorities concerning the events of October 12, 2015.

108. Defendant, HAWKINS, failed to notify his insurance company or file any claim concerning the events of October 12, 2015.

109. Defendant, SPECIALIST CARS, failed to notify the police or file a report with the authorities concerning the events of October 12, 2015.

110. Defendant, SPECIALIST CARS, failed to notify its insurance company or file any claim concerning the events of October 12, 2015.

111.Defendant, EDWARDS, has repeatedly represented that he removed the aforementioned eight (8) Missing Cars from the facility maintained by Defendant, SPECIALIST CARS, on October 12, 2015.

112. Defendants, HOWARTH and LIMBANI, have acknowledged assisting Defendant, Edwards, in removing and transporting one or more of the Missing Cars from Defendant, SPECIALIST CAR's, premises on October 12 and 13, 2015.

113. Defendant, EDWARDS, claims that on October 13, 2015, he sold the “Ferrari F40” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

114. Defendant, EDWARDS, claims that on October 13, 2015, he sold the “Porsche Touring-White” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

115. Defendant, EDWARDS, claims that on October 13, 2015, he sold the “Miura” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

116. Defendant, EDWARDS, claims that on October 13, 2015, he sold the “Porsche Lightweight” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

117. On or about October 13, 2015, Defendant, EDWARDS, sold the “Porsche Touring-Orange” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

118. On or about October 13, 2015, Defendant, EDWARDS, sold the “Porsche 959” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

119. On or about October 13, 2015, Defendant, EDWARDS, sold the “Ferrari 365” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

120. On or about October 13, 2015, Defendant, EDWARDS, sold the “Montreal” to an individual he described as an “underworld” figure, namely Defendant, SMITH.

121. Defendant, EDWARDS, has represented that Defendant, SMITH, purchased the aforementioned eight (8) Missing Cars as an agent for Defendant, FOOS.

122. Defendant, FOOS, acting through their agent, Defendant, SMITH, allegedly purchased the aforementioned eight (8) Missing Cars from Defendant, EDWARDS, for the sum of £800,000.

123. The aforementioned sum of £800,000 (approximately $1,200,000.00) represents less than one-third (1/3) of the market value of the aforementioned eight (8) Missing Cars.

124. Defendant, EDWARDS, has claimed that he needed the proceeds of the aforementioned unauthorized sale of the Missing Cars, in part, to pay his pre-existing obligations.

125. Defendant, EDWARDS, has also claimed that he needed to proceeds of the aforementioned unauthorized sale of the Missing Cars, in part, to make payments to co-defendants, HAMANN and LANDMARK CAR, in the respective amounts of $150,000.00 and £200,000, respectively.

126. Defendants, HAMANN and LANDMARK CAR, have, however, denied receiving any payments from the sales of the Missing Cars.

127. Defendant, EDWARDS, has repeatedly failed and refused to otherwise account for the foregoing £800,000 in unauthorized sale proceeds.

128. Defendant, EDWARDS, met with Plaintiff's prior attorney, Fergus Buckley, on or about November 25, 2015, and again on or about December 14, 2015.

129. At each of these meetings with attorney, Fergus Buckley, Defendant, EDWARDS, stated that he had taken the Missing Cars from the facilities of Defendant, SPECIALIST CARS, on October 12, 2015, and had secreted them with confederates until his demands could be met, but refused to disclose the Missing Cars' whereabouts.

130. During their meeting on or about November 25, 2015, at the Goering Hotel in London, Defendant, EDWARDS, made a demand to attorney, Fergus Buckley, that Plaintiff pay Defendant, EDWARDS, approximately $1,100,000.00 to secure the return of the Missing Cars.

131. Plaintiff rejected Defendant, EDWARDS', ransom demand.

132. At their meeting on or about December 14, 2015, at the Balthzaar Restaurant in London, Defendant, EDWARDS, again made a demand to attorney, Fergus Buckley, for a payment from Plaintiff, albeit for a reduced sum, of approximately $800,000.00, but for the return of only four (4) of the eight (8) Missing Cars, namely the "Porsche Lightweight," the "Porsche Touring– White," the "Porsche 959" and the "Ferrari 365."

133. At their meeting on or about December 14, 2015, Defendant, EDWARDS, also suggested to Plaintiff's attorney, Fergus Buckley, that £50,000 a month in payments were required for the Plaintiff's Missing Cars to kept safe and capable of being recovered.

134. Plaintiff also rejected Defendant, EDWARDS', second ransom demand.

135. At the conclusion of the December 14, 2015, meeting, Defendant, EDWARDS, handed attorney, Fergus Buckley, a napkin on which Defendant, EDWARDS, had written a description of the four (4) Missing Cars that Defendant, EDWARDS, was prepared to return to Plaintiff in consideration for the reduced ransom payment of approximately $800,000.00. <u>See</u> "Exhibit B."

136. At the same December 14, 2015 meeting, Defendant, EDWARDS, also warned attorney, Fergus Buckley, that, if Plaintiff did not promptly terminate enforcement proceedings against Defendant, EDWARDS, Plaintiff would never see any of his Missing Cars again.

137. The "Ferrari F40" was not present at the premises maintained by Defendant, SPECIALIST CARS, on October 12, 2015.

138. The "Ferrari F40", which Plaintiff had paid for, was never actually purchased and/or obtained by any of the Defendants.

139. Defendants fraudulently retained the funds paid by Plaintiff for the purchase of the "Ferrari F40".

140. The "Ferrari F40" was not present at the premises of Defendant, SPECIALIST CARS, on October 12, 2015.

141. Defendants conspired to fraudulently divert and convert Plaintiff's funds, remitted for the purchase of the "Ferrari F40", to certain of the Defendants and their Co-Conspirators for their own use and benefit.

142. Between February 2015 and October 2015, the Defendants actively conspired to prevent Plaintiff from knowing that the "Ferrari F40" had never been purchased by or for Plaintiff and that Plaintiff's purchase money had been secretly and wrongly diverted to other unauthorized uses.

143. The "Porsche Touring–White" was not present at the premises of Defendant, SPECIALIST CARS, on October 12, 2015.

144. Defendants had sold the "Porsche Touring-White" prior to October 12, 2015.

145. Defendants sold the "Porsche Touring-White", without the consent of Plaintiff, as required by the Agreement.

146. The proceeds from the unauthorized sale of the "Porsche Touring-White" were fraudulently converted by Defendants to their own use and benefit.

147. Between late July and October 12, 2015, the Defendants actively conspired to prevent Plaintiff from learning that the "Porsche Touring-White" had been sold.

148. On information and belief, Defendants had sold the "Miura" prior to October 12, 2015.

149. On information and belief, Defendants sold the “Miura” (and possibly the “Montreal”) to Defendant, DOE 1, without the consent of Plaintiff, as required by the Agreement, for, among other consideration, the sum of £292,000 (approximately $450,000.00).

150. The cash proceeds from the unauthorized sale of the “Miura” were fraudulently converted by Defendants to their own use and benefit.

151. Between August and October 2015, the Defendants actively conspired to prevent Plaintiff from learning that the “Miura” had been sold to Defendant, DOE 1.

152. As of July 1, 2016, the whereabouts of the “Miura” remain unknown to Plaintiff.

153. On information and belief, the “Porsche Lightweight” was secretly and wrongfully converted by Defendants to their own use and benefit on or after October 12, 2015.

154. As of July 1, 2016, the whereabouts of the "Porsche Lightweight" remain unknown to Plaintiff.

155. On information and belief, the “Porsche Touring-Orange” was secretly and wrongfully converted by Defendants to their own use and benefit on or after October 12, 2015.

156. As of April 1, 2016, the whereabouts of the "Porsche Touring-Orange" remain unknown to Plaintiff.

157. On information and belief, the “Porsche 959” was secretly and wrongfully converted by Defendant, EDWARDS, and certain of his co-conspirators for their own use and benefit on or after October 12, 2015.

158. As of July 1, 2016, the whereabouts of the "Porsche 959" remain unknown to Plaintiff.

159. On information and belief, the “Ferrari 365” was secretly and wrongfully converted by Defendants to their own use and benefit on or after October 12, 2015.

160. As of July 1, 2016, the whereabouts of the "Ferrari 365" remain unknown to Plaintiff.

161. On information and belief, Defendants sold the "Montreal" prior to October 12, 2015.

162. On information and belief, Defendants sold the "Montreal" to Defendant, DOE 1, without the consent of Plaintiff, as required by the Agreement.

163. On information and belief, between August and October 2015, Defendants actively conspired to prevent Plaintiff from learning that the "Montreal" had been sold to Defendant, DOE 1.

164. As of July 1, 2016, the whereabouts of the "Montreal" remain unknown to Plaintiff.

165. On information and belief, Defendant, HAWKINS, and certain of his co-conspirators fabricated the alleged October 12, 2015, theft in order to cover-up the absence of the "Ferrari F40" from the facilities of Defendant, SPECIALIST CARS, on October 12, 2015; the fraudulent/unauthorized sales of some or all of the Missing Cars prior to October 12, 2015; and, possibly, other of Defendants' illegal schemes.

166. On information and belief, Defendant, HAWKINS, and certain of his co-conspirators colluded to prevent Plaintiff from discovering the absence of the "Ferrari F40" at the facility maintained by Defendant, SPECIALIST CARS, on October 12, 2015; the fraudulent/ unauthorized sales of some or all of the Missing Cars prior to October 12, 2015; and, possibly, other of Defendants' illegal schemes.

167. Defendant, HAMANN, has marketed for sale certain of the Missing Cars for the benefit of Defendant, EDWARDS, including the "Porsche 959," even after being warned that these cars had been stolen from Plaintiff.

168. Defendant, LIMBANI, has marketed for sale certain of the Missing Cars for the benefit of Defendant, EDWARDS, including the “Porsche 959,” even after being warned that these cars had been stolen from Plaintiff.

169. In addition to the aforementioned eight (8) Missing Cars, Defendant, EDWARDS, and certain other of his co-conspirators converted for the own use and benefit a Porsche Speedster - Grey - s/n 6889/61/1 (hereinafter “Porsche Speedster”) belonging to Plaintiff, which was not present at Defendant, SPECIALIST CARS’, facility on October 12, 2015.

**FACTS**
**(FERRARI F40 - RED - S/N ZFFGJ 34B 0000 80707)**

170. Defendant, EDWARDS, had identified for Plaintiff a red Ferrari F40 automobile (chassis number ZFFGJ 34B 0000 80707) (hereinafter "Ferrari F40”) that was for sale in Yokohama, Japan.

171. Defendant, EDWARDS, persuaded Plaintiff to purchase the aforementioned “Ferrari F40.”

172. Defendant, EDWARDS, represented to Plaintiff that the “Ferrari F40” was being offered for sale by Antea Cars of Yokohama, Japan.

173. On or about July 29, 2014, Defendant, SCHOLES, sent an email correspondence to Plaintiff, that was received at his home in New York, soliciting Plaintiff to provide a deposit for the purchase of the “Ferrari F40.”

174. Defendant, SCHOLES, requested that Plaintiff provide an initial deposit in the amount of €150,000, to be paid to JPC Trade Co., for the purchase of the “Ferrari F40.”

175. Defendant, SCHOLES, represented to Plaintiff that JPC Trade Co. was the acting agent for the Japanese seller of the “Ferrari F40.”

176. On or about July 29, 2014, on Plaintiff's instruction, Defendant, SPECIALIST CARS, paid the sum of €150,000, from funds being held on Plaintiff's behalf, to JPC Trade Co. as a deposit for the purchase of the "Ferrari F40."

177. On or about July 29, 2014, Defendant, SCHOLES, sent an email correspondence to Defendant, EDWARDS, which was forwarded to Plaintiff, assuring Plaintiff that the "Ferrari F40" and all associated funds on deposit would be held "Solely" to Plaintiff's order.

178. On or about July 31, 2014, Defendant, SPECIALIST CARS, confirmed by email to Plaintiff that the foregoing deposit payment had been made on Plaintiff's behalf to JPC Trade Co.

179. In or around November 2014, Defendant, EDWARDS, solicited from Plaintiff an additional payment to complete the acquisition of the "Ferrari F40" from its Japanese seller.

180. On or about November 26, 2014, Plaintiff arranged for the payment of $310,000.00 to the account of Defendant, SCHOLES, doing business as Defendant, LEFT HAND, at Currencies Direct of London, to complete Plaintiff's purchase of the "Ferrari F40."

181. The foregoing payment of $310,000.00 was specifically designated to be payment for the purchase of the "Ferrari F40".

182. On or about January 24, 2015, Defendant, HAWKINS, sent an email correspondence to Plaintiff assuring him that Plaintiff's $310,000.00 final payment for the "Ferrari F40" had been received in Japan on December 2, 2014. See "Exhibit C."

183. Defendant, HAWKINS', January 24, 2015, email to Plaintiff further represented that Defendant, SPECIALIST CARS, was acting as Plaintiff's agent regarding the "Ferrari F40" transaction. See "Exhibit C."

184. On or about January 24, 2015, Defendant, SPECIALIST CARS, issued a purchase invoice, dated July 22, 2014, acknowledging Plaintiff's purchase of the "Ferrari F40." See "Exhibit D."

185. On or about February 19, 2015, Defendants, HAWKINS and SPECIALIST CARS, provided confirmation to Plaintiff that the subject "Ferrari F40" was being imported into the United Kingdom, on a temporary import license. See "Exhibit E."

186. On February 19, 2015, Defendants, HAWKINS and SPECIALIST CARS, further advised Plaintiff that the arrival of the "Ferrari F40" at Defendant, SPECIALIST CARS', facility was imminent.

187. On or about March 5, 2015, Defendant, EDWARDS, purporting to be acting on Plaintiff's behalf, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS. See "Exhibit F."

188. The aforementioned "SoR" stated that the "Ferrari F40" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf, with a minimum value to be returned to Plaintiff of £550,000. See "Exhibit F."

189. On or about March 12, 2015, Defendant, HAWKINS, sent email correspondences to Plaintiff assuring him that the "Ferrari F40" had arrived at Defendant, SPECIALIST CARS', facility and was being held and offered for sale on Plaintiff's behalf. See "Exhibit G."

190. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Ferrari F40" was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See "Exhibit G."

191. Plaintiff relied upon multiple assurances given to him by Defendant, HAWKINS, on July 31, 2014, January 24, 2015, March 12, 2015, and thereafter concerning the presence of the "Ferrari F40" at the premises of Defendant, SPECIALIST CARS.

192. On various occasions between March 12, 2015, and September 18, 2015, Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, sent multiple email correspondence to Plaintiff reassuring him that the "Ferrari F40" was being held at Defendant, SPECIALIST CARS', facility for the benefit of Plaintiff.

193. At various times between March 12, 2015, and October 12, 2015, Plaintiff explicitly notified Defendants, HAWKINS and SPECIALIST CARS, that they were not to turn over possession of the "Ferrari F40" to Defendant, EDWARDS. <u>See</u> "Exhibit H."

194. In August 2015, Plaintiff sent a correspondence to Defendant, HAWKINS, requesting that a representative of Plaintiff be permitted to retrieve the "Ferrari F40" from the facility maintained by Defendant, SPECIALIST CARS, in order to allow Plaintiff to bring the "Ferrari F40" back to the United States.

195. Defendant, HAWKINS, refused Plaintiff's request, claiming that Defendant, SPECIALIST CARS, had an "SoR" agreement that could not be terminated without an extended notice period.

196. On or about September 14, 2015, Defendant, HAWKINS, reported to Plaintiff that he was in negotiations to sell the "Ferrari F40" to one of his company's clients for £700,000.

197. On September 16, 2015, Defendant, HAWKINS, explained by telephone to Plaintiff's attorney, Fergus Buckley, that Plaintiff could not collect the "Ferrari F40" because a sale of the vehicle had been agreed to.

198. On September 18, 2015, Defendant, HAWKINS, again reassured Plaintiff that the “Ferrari F40” was being held at Defendant, SPECIALIST CARS’, facility to be sold on Plaintiff’s behalf.

199. On September 18, 2015, Defendant, HAWKINS, reported to Plaintiff that a contract had been issued by Defendant, SPECIALIST CARS, for the sale of the “Ferrari F40” for the purchase price of £640,000.

200. The Sales Contract described by Defendant, HAWKINS, in his email dated September 18, 2015, was never consummated.

201. The Sales Contract described by Defendant, HAWKINS, in his email dated September 18, 2015, never existed.

202. The description of the Sales Contract provided by Defendant, HAWKINS, in his email dated September 18, 2015 was a knowingly false and misleading representation.

203. The foregoing false and misleading reports were intended to deceive Plaintiff into believing that the "Ferrari F40" was present at the facility maintained by Defendant, SPECIALIST CARS, between September 14, 2015, and September 18, 2015.

204. On information and belief, the false information contained in Defendant, HAWKINS’, email to Plaintiff dated September 18, 2015, was provided as part of Defendants, HAWKINS, EDWARDS and SPECIALIST CARS’, continuing conspiracy to conceal the fact that the “Ferrari F40” was never present at Defendant, SPECIALIST CARS’, facility, as had been repeatedly represented to Plaintiff.

205. On or about October 12, 2015, Defendant, HAWKINS, reported to Plaintiff that the "Ferrari F40" had been removed that evening from Defendant, SPECIALIST CARS', facility by Defendant, EDWARDS.

206. Defendant, EDWARDS, subsequently stated that he had removed the "Ferrari F40" from Defendant, SPECIALIST CARS', facility on October 12, 2015.

207. Defendant, EDWARDS, stated that he had sold the "Ferrari F40" to Defendants, SMITH and FOOS, on October 13, 2015.

208. On information and belief, most, if not all, of the aforementioned statements and representations made by Defendants, HAWKINS, EDWARDS, SPECIALIST CARS and SCHOLES, concerning the "Ferrari F40" were knowingly false and intended to defraud and deceive Plaintiff.

209. The United Kingdom's DVLA and HMRC agencies have no record of the "Ferrari F40" being imported into the United Kingdom in 2014 or 2015.

210. Takashi Wantanabi, the managing director of Antea Cars, the alleged Japanese seller of the "Ferrari F40", denies that it was ever sold to anyone associated with the Plaintiff and/or the Defendants. <u>See</u> "Exhibit I."

211. Furthermore, Takashi Wantanabi, the managing director of Antea Cars, the alleged Japanese seller of the "Ferrari F40," denies that the vehicle was exported from Japan prior to April 2015.

212. Despite repeated demands and requests from Plaintiff, Defendants, HAWKINS and SPECIALIST CARS, have consistently refused to provide Plaintiff with any evidence

demonstrating that the "Ferrari F40" was ever imported into the United Kingdom on a temporary import license, as Defendant, HAWKINS, had represented.

213. Despite repeated demands and requests from Plaintiff, Defendants, HAWKINS and SPECIALIST CARS, have consistently refused to provide Plaintiff with any evidence demonstrating that the "Ferrari F40" was physically at Defendant, SPECIALIST CARS', facility at any time between February 19, 2015, and October 12, 2015.

214. On or about December 18, 2015, Defendant, EDWARDS, finally admitted to Plaintiff that the "Ferrari F40" had never been purchased, as had been previously represented.

215. On or about January 6, 2016, Defendant, EDWARDS, admitted to Plaintiff and a third-party, on a telephone call received by Plaintiff at his home in the United States, that the "Ferrari F40" had never been purchased for Plaintiff, as he had previously represented.

216. In an email correspondence to a third party, dated January 6, 2016, Defendant, EDWARDS, again admitted that the "Ferrari F40" had never been purchased by or for Plaintiff, as had been previously represented.

217. Defendant, SCHOLES, has confirmed that the deposit previously paid by Plaintiff for the purchase of the "Ferrari F40" was returned and the purchase of the "Ferrari F40" was never completed.

218. Defendant, SCHOLES, has refused to identify the recipient of the returned deposit funds.

219. The "Ferrari F40" was not removed from Defendant, SPECIALIST CARS', facility on the night of October 12, 2015, as had been reported by Defendants, EDWARDS, HAWKINS and SPECIALIST CARS.

220. The “Ferrari F40” was not physically present at Defendant, SPECIALIST CARS’, facility at any time between February 19, 2015 and October 12, 2015, as had been reported by Defendants, EDWARDS, HAWKINS and SPECIALIST CARS..

221. The “Ferrari F40” was not imported into the United Kingdom, as had been reported by Defendants, EDWARDS, HAWKINS and SPECIALIST CARS.

222. The “Ferrari F40” was never purchased, on Plaintiff’s behalf or for Plaintiff’s benefit, from its Japanese seller, as had been reported by Defendants, EDWARDS, HAWKINS , SPECIALIST CARS and SCHOLES.

223. The monies Plaintiff provided to Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, for the purchase of the “Ferrari F40” were fraudulently converted and diverted by Defendants to their own personal use and benefit.

224. The correspondences Plaintiff received from Defendant, HAWKINS, representing that a sale of the “Ferrari F40” was imminent, were merely attempts to further the conspiracy by preventing Plaintiff from discovering that the “Ferrari F40” was never physically present at Defendant, SPECIALIST CARS’, facility.

225. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, have conspired to commit overt acts to defraud Plaintiff of the value of the “Ferrari F40” through wire fraud, mail fraud and other criminal/illegal activities.

226. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, have committed overt acts to defraud Plaintiff of the value of the “Ferrari F40” through wire fraud, mail fraud and other criminal/illegal activities.

227. Plaintiff has suffered damages relating to the "Ferrari F40" in the amount of $975,000.00, which represents the approximate market value of the "Ferrari F40" at the time of Defendants' fraud.

**FACTS**
**(PORSCHE 2.7RS TOURING - WHITE - S/N 3601303)**

228. Defendant, EDWARDS, identified for Plaintiff a white Porsche 2.7RS Touring automobile (Chassis number 3601303) (hereinafter "Porsche Touring-White") that was for sale in Paris, France.

229. Defendant, EDWARDS, persuaded Plaintiff to purchase the "Porsche Touring-White."

230. On or about May 6, 2014, Plaintiff agreed to purchase the "Porsche Touring-White" from the Articurial Auction Company, located in Paris, France, for the sum of €240,000.

231. On or about June 27, 2014, Plaintiff arranged for the payment of the agreed upon purchase price to be made to the Articurial Auction Company, in order to complete the purchase of the "Porsche Touring-White."

232. On or about July 11, 2014, the "Porsche Touring-White" was transported, via Straight Eight Logistics auto transporters (hereinafter "Straight Eight"), from Paris to the United Kingdom, at Plaintiff's sole cost and expense. See "Exhibit J."

233. On or about September 8, 2014, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Porsche Touring-White."

234. The aforementioned "SoR" stated that the "Porsche Touring-White" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf, with a minimum value to be returned to Plaintiff of £495,000.

235. The engine on the "Porsche Touring-White" was subsequently replaced by Tuthill Porsche in the United Kingdom, at Plaintiff's sole cost and expense.

236. On or about September 25, 2014, Defendant, HAWKINS, assured Plaintiff that Defendant, SPECIALIST CARS, was "holding and selling [the "Porsche Touring-White"] for [Plaintiff]" and that Defendant, HAWKINS, would "understand and … abide by [Plaintiff's] wishes 100%" with regards to the "Porsche Touring-White". See "Exhibit K."

237. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff warned Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, had no ownership interest in the "Porsche Touring-White" and had no authority to agree to its sale and/or transfer. See "Exhibit L."

238. Plaintiff relied upon multiple assurances given by Defendant, HAWKINS, on September 25, 2014, March 12, 2015 and thereafter regarding the status of the "Porsche Touring-White" being held at Defendant, SPECIALIST CARS', facility, for Plaintiff's benefit as its owner.

239. On or about March 12, 2015, Defendants, HAWKINS and SPECIALIST CARS, represented to Plaintiff that the "Porsche Touring-White" was being held at Defendant, SPECIALIST CARS', premises on Plaintiff's account. See "Exhibit G."

240. On March 12, 2015, Plaintiff expressly advised Defendants, HAWKINS and SPECIALIST CARS, that the "Porsche Touring-White" was "being held to [Plaintiff's] order and [could not] be sold or transferred without [Plaintiff's] specific authority." See "Exhibit G."

241. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Porsche Touring-White" was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See “Exhibit G.”

242. On multiple occasions between July 11, 2014 and October 12, 2015, Plaintiff explicitly advised Defendants, HAWKINS and SPECIALIST CARS, that possession of the “Porsche Touring-White” should not be turned over to Defendant, EDWARDS. See “Exhibit H.”

243. Defendants, HAWKINS, SPECIALIST CARS and EDWARDS, have represented that Defendant, EDWARDS, removed the “Porsche Touring-White” from Defendant, SPECIALIST CARS’, facility on the evening of October 12, 2015.

244. Defendants, HAWKINS and SPECIALIST CARS, have represented that as of October 12, 2015, the “Porsche Touring-White” had not been sold.

245. Defendants, EDWARDS, HAWKINS and SPECIALIST CARS’, aforementioned representations were willfully false and intentionally misleading.

246. The “Porsche Touring-White” had been sold and removed from Defendant, SPECIALIST CARS', premises prior to October 12, 2015.

247. The “Porsche Touring-White” was sold to a German purchaser, Michael Roock d/b/a Roock SportSystem, in July 2015.

248. Defendants, HAWKINS, SPECIALIST CARS, WILLIAMS and HOWARTH, misled one or more potential purchasers into believing that Defendant, EDWARDS, had the authority to sell the "Porsche Touring-White.”

249. Defendant, EDWARDS, misled one or more potential purchasers into believing that he had the authority to sell the "Porsche Touring-White.”

250. Defendants, EDWARDS, HAWKINS, WILLIAMS and HOWARTH, knowingly concealed from one or more potential purchasers the fact that Plaintiff was the legal owner of the "Porsche Touring-White."

251. Defendants, EDWARDS and HOWARTH, knowingly deceived one or more potential buyers into believing that the person from whom Plaintiff had already bought the "Porsche Touring-White" was still its legal title holder.

252. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS and HOWARTH, had engaged in discussions with the purchaser, Michael Roock d/b/a Roock SportSystem's, agent and were aware of the aforementioned sale.

253. The unauthorized sale of the "Porsche Touring-White" to Michael Roock d/b/a Roock SportSystem, was consummated with the active participation of Defendants, LANDMARK CAR, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS, PATTINSON and HOWARTH.

254. Contrary to the representations made by Defendants, HAWKINS and SPECIALIST CARS, immediately prior to the unauthorized sale, the "Porsche Touring-White" was in storage at a facility owned and maintained by Defendant, LANDMARK CAR.

255. The "Porsche Touring-White" was delivered to the purchaser, Michael Roock d/b/a Roock SportSystem, from the facility owned and maintained by Defendant, LANDMARK CAR.

256. Documents related to the "Porsche Touring-White" were retained by Defendant, LANDMARK CAR, at the time of the sale and subsequently delivered by Defendant, LANDMARK CAR, to its German purchaser, Michael Roock d/b/a Roock SportSystem.

257. The foregoing unauthorized sale of the "Porsche Touring-White" to Michael Roock d/b/a Roock SportSystem was consummated without the approval, authorization and/or knowledge of Plaintiff.

258. The foregoing sale of the "Porsche Touring-White" to Michael Roock d/b/a Rook SportSystem was consummated in direct contravention of the specific assurances provided to Plaintiff by Defendants, HAWKINS and SPECIALIST CARS, in email correspondences sent to Plaintiff on September 25, 2014 and March 12, 2015. See "Exhibit G" and "Exhibit L."

259. The aforementioned unauthorized sale was in direct contravention of assurances given to Plaintiff by Defendant, PATTINSON, that neither he nor Defendant, LANDMARK CAR, had played any role in the sale of the "Porsche Touring-White."

260. The actual sale of the "Porsche Touring-White" was executed by Defendant, HOWARTH.

261. Defendant, HOWARTH, was designated by Defendant, EDWARDS, to act as the seller of the "Porsche Touring-White" in the sale transaction.

262. Defendants, EDWARDS, WILLIAMS and HOWARTH, repeatedly misrepresented to the purchaser of the "Porsche Touring-White" that Defendant, EDWARDS, had the authority to sell the "Porsche Touring-White."

263. Defendant, HOWARTH, executed the sale agreements purporting to convey the "Porsche Touring-White" to Michael Roock d/b/a Roock SportSystem.

264. Defendant, HOWARTH, received the £390,000 consideration paid for the "Porsche Touring-White" in the form of a Porsche 993RS automobile taken in part exchange and the sum of £140,000.

265. Defendant, HOWARTH, subsequently sold the Porsche 993RS, which had been taken in part exchange for the “Porsche Touring-White,” for the sum of £240,000.

266. At the time of the aforementioned unauthorized sale, Defendant, HOWARTH, was not the owner of the "Porsche Touring-White.”

267. At the time of the aforementioned unauthorized sale, the "Porsche Touring-White" had not been entrusted to Defendant, HOWARTH, by Plaintiff.

268. At the time of the aforementioned unauthorized sale, Defendant, HOWARTH, had no authority to sell the "Porsche Touring-White.”

269. At the time of the aforementioned unauthorized sale, the "Porsche Touring-White" was a stolen car.

270. Defendants, LANDMARK CAR and PATTINSON, misled Plaintiff with regard to the already consummated sale of the "Porsche Touring-White" by denying any involvement in the sale of any automobiles owned by Plaintiff, other than the "Porsche Speedster.”

271. Defendants, LANDMARK CAR and PATTINSON, assisted Defendant, EDWARDS, in concealing the unauthorized sale of the "Porsche Touring-White" from Plaintiff.

272. Defendants, EDWARDS and HOWARTH, provided no notice to Plaintiff concerning the unauthorized sale of the “Porsche Touring-White.”

273. Plaintiff did not receive any of the proceeds from the aforementioned unauthorized sale of the “Porsche Touring-White” to Michael Roock d/b/a Roock SportSystem.

274. Defendant, HOWARTH, intentionally sought to mislead Plaintiff with regard to the already consummated sale of the “Porsche Touring-White” by denying any involvement in the sale or disposition of any automobiles owned by Plaintiff. See “Exhibit M.”

275. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH and certain of their Co-Conspirators, wrongfully and fraudulently converted the proceeds from the unauthorized sale of the “Porsche Touring-White” for their own personal use and benefit.

276. Defendants conspired to send knowingly false and misleading information to Plaintiff in order to avoid detection of their scheme to fraudulently convert the proceeds from the unauthorized sale of the “Porsche Touring-White” to their own personal use and benefit.

277. The sale of the “Porsche Touring-White” was facilitated and subsequently covered up by the false and misleading emails sent to Plaintiff and Plaintiff’s counsel, Fergus Buckley, by Defendants, HAWKINS and SPECIALIST CARS, between September 14, 2015, and September 18, 2015.

278. The unauthorized and fraudulent sale of the “Porsche Touring-White” was further enabled due to the false and misleading email correspondence sent to Plaintiff in the United States by Defendant, PATTINSON.

279. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS, HOWARTH, LANDMARK CAR and PATTINSON, have conspired to commit overt acts to defraud Plaintiff of the value of the “Porsche Touring-White” through wire fraud, mail fraud and additional criminal/illegal activities.

280. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS, HOWARTH, LANDMARK CAR and PATTINSON, have committed overt acts to defraud Plaintiff of the value of the “Porsche Touring-White” through wire fraud, mail fraud and additional criminal/illegal activities.

281. Plaintiff has suffered damages relating to the “Porsche Touring-White” in the amount of $750,000.00, which was the approximate fair market value of the “Porsche Touring-White” at the time of Defendants’ fraud.

**<u>FACTS</u>**
**(LAMBORGHINI MIURA - ORANGE - S/N 3925)**

282. Defendant, EDWARDS, identified for Plaintiff an orange Lamborghini Miura S automobile (Chassis number 3925) (hereinafter the “Miura”) that was for sale in France.

283. Defendant, EDWARDS, persuaded Plaintiff to purchase the “Miura.”

284. Defendant, EDWARDS, represented to Plaintiff that the seller of the “Miura” was Defendant, LEFT HAND.

285. Plaintiff agreed to purchase the "Miura" from Defendant, LEFT HAND, along with the "Montreal" as hereinafter described.

286. On or about December 2014, Defendants, EDWARDS and SCHOLES, solicited Plaintiff to provide an initial deposit for the purchase of the “Miura” and the “Montreal" in the amount of €60,000.

287. Defendant, EDWARDS, directed Plaintiff to pay the €60,000 deposit to the account of Defendant, SCHOLES (doing business as Defendant, LEFT HAND), at Currencies Direct in London.

288. On or about January 6, 2015, Plaintiff arranged for the payment of €60,000 as an initial deposit for the purchase of the “Miura” and the "Montreal" to be made to the account of Defendant, SCHOLES, at Currencies Direct in London.

289. On or about February 2, 2015, Plaintiff arranged for an additional payment in the amount of €46,650 to be made by Defendant, SPECIALIST CARS, from funds being held for Plaintiff's benefit, in connection with Plaintiff's purchase of the "Miura" and the "Montreal."

290. On or about February 5, 2015, Plaintiff arranged for a final payment in the amount of €294,100 to be made to the account of Defendant, SCHOLES, doing business as Defendant, LEFT HAND, at Currencies Direct in London, thereby completing Plaintiff's purchase of the "Miura" and the "Montreal."

291. On or about March 5, 2015, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Miura." See "Exhibit N."

292. The aforementioned "SoR" stated that the "Miura" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf with a minimum value to be returned to Plaintiff of $650,000.00. See "Exhibit N."

293. On or about March 12, 2015, Defendants, HAWKINS and SPECIALIST CARS, represented to Plaintiff that the "Miura" was being held at Defendant, SPECIALIST CARS', facility for the benefit of Plaintiff. See "Exhibit G."

294. On or about March 12, 2015, Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Miura" was being be insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See "Exhibit G."

295. On or about March 16, 2015, at Defendant, EDWARDS', urging, Plaintiff accepted a £50,000 "non-refundable deposit" on a contract to purchase the "Miura" for the price of approximately $750,000.00.

296. The potential purchaser under the above-referenced contract subsequently defaulted and Plaintiff retained the forfeited “non-refundable deposit.”

297. In or around May 2015, again at the urging and insistence of Defendant, EDWARDS, Plaintiff accepted a second contract for the purchase of the “Miura” from the same purchaser for a reduced price of $650,000.00.

298. The second contract of sale required a “non-refundable deposit”/option payment of $300,000.00, due upon execution of the contract.

299. Defendant, HAWKINS, represented to Plaintiff that Defendant, SPECIALIST CARS, had received the aforementioned “non-refundable deposit”/option from the prospective buyer on or about June 9, 2015.

300. Nonetheless, Defendant, SPECIALIST CARS, failed to turnover to Plaintiff the aforementioned “non-refundable deposit”/option payment until August 3, 2015.

301. Defendants, HAWKINS and SPECIALIST CARS, have refused repeated requests by Plaintiff and his attorneys to provide evidence of the date of receipt of the funds sent for the aforementioned “non-refundable deposit”/option payment.

302. Defendants, HAWKINS and SPECIALIST CARS, have refused repeated requests by Plaintiff to disclose the identity of the source of the funds received for the aforementioned “non-refundable deposit”/option payment.

303. After failing to meet repeated deadlines, the purchaser agreed that it would forfeit the foregoing “non-refundable deposit”/option payment if it could not complete the purchase of the “Miura” by July 8, 2015.

304. The above-referenced purchaser again failed to complete the purchase of the “Miura” on or before the agreed upon deadline of July 8, 2015.

305. Subsequently, Plaintiff terminated the second contract of sale and retained the non-refundable deposit/option payment.

306. Shortly thereafter, Plaintiff made repeated demands to Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, for the redelivery of the “Miura” by Defendant, SPECIALIST CARS, to Plaintiff or his agents.

307. Each of Plaintiff’s demands to Defendant, SPECIALIST CARS, for redelivery of the “Miura” was met with excuses, refusals and or referrals to Defendant, EDWARDS.

308. Each of Plaintiff’s demands to Defendant, HAWKINS, for redelivery of the “Miura” was met with excuses, refusals and or referrals to Defendant, EDWARDS.

309. Between July 8, 2015 and October 12, 2015, Plaintiff repeatedly advised Defendants, HAWKINS and SPECIALIST CARS, that, under no circumstances, were they to turn over possession of the “Miura” to Defendant, EDWARDS. See “Exhibit H.”

310. Between July 8, 2015, and October 12, 2015, Plaintiff repeatedly advised Defendants, HAWKINS and SPECIALIST CARS, that the “Miura” should not be sold to anyone without Plaintiff’s prior express authorization.

311. On or about September 14, 2015, Defendant, HAWKINS, reported to Plaintiff that Defendant, HAWKINS, was in negotiations to sell the "Miura" to one of his clients for the sum of $700,000.00.

312. On or about September 16, 2015, by telephone, Defendant, HAWKINS, explained to attorney, Fergus Buckley, that Plaintiff could not collect the "Miura" because a sale of the car had been agreed to.

313. On or about September 18, 2015, Defendant, HAWKINS, reported to Plaintiff and Plaintiff's counsel, Fergus Buckley, that a new contract had been issued for the sale of the "Miura."

314. Furthermore, on September 18, 2015, Defendant, HAWKINS, sent an email correspondence to Plaintiff representing that the $650,000.00 payment of the purchase price for the "Miura" had been received. See "Exhibit O."

315. Defendants, HAWKINS and SPECIALIST CARS, however, refused to turn over the payment it claimed to have received for the purchase of the "Miura" to Plaintiff.

316. Despite Plaintiff's express directions/prohibitions of any such sale, on or about August 2015, Defendant, EDWARDS, purported to sell the "Miura" to Defendant, DOE 1.

317. On information and belief, Plaintiff alleges that the sale reported by Defendants, HAWKINS and SPECIALIST CARS, was a ruse created to conceal Defendant, EDWARDS', continued efforts to sell the "Miura" to Defendant, DOE 1, or the fact that it had already been sold to Defendant, DOE 1.

318. In August or September 2015, Defendant, EDWARDS, consummated an unauthorized sale of the "Miura" to Defendant, DOE 1.

319. Despite repeated requests, Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, have repeatedly failed and refused to provide Plaintiff with documentary evidence as to the

source of any of the payments Defendant, SPECIALIST CARS, claims to have received for the “Miura."

320. Despite repeated requests, Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, have repeatedly failed and refused to provide Plaintiff with documentary evidence as to the identity of Defendant, DOE 1, who is alleged to be the purchaser of the “Miura."

321. On information and belief, Defendant, SWEENEY, was an integral figure involved in the unauthorized sale of the “Miura” to Defendant, DOE 1.

322. Between July 31, 2015, and August 11, 2015, Defendant, DOE 1, paid approximately £292,000 to Defendant, EDWARDS, in connection with the alleged purchase of the “Miura.”

323. Defendant, EDWARDS, claimed to have retained £42,000 of the aforementioned payment received from Defendant, DOE 1, for the purchase of the “Miura.”

324. Defendant, EDWARDS, claimed to have turned the remaining £250,000 over to Defendant, SWEENEY.

325. None of the aforementioned funds allegedly paid by Defendant, DOE 1, to Defendant, EDWARDS, were paid to or received by Plaintiff.

326. On information and belief, after receiving the above-referenced payments, Defendant, EDWARDS, turned over possession of the “Miura” to Defendant, DOE 1.

327. On information and belief, Defendant, EDWARDS, turned over possession of the “Miura” to Defendant, DOE 1, without Plaintiff’s approval, authority or prior knowledge.

328. Defendant, EDWARDS, was not the owner of the “Miura" at the time of the aforementioned unauthorized sale to Defendant, DOE 1.

329. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the “Miura" at the time of the aforementioned unauthorized sale to Defendant, DOE 1.

330. Plaintiff had not entrusted the “Miura” to Defendant, EDWARDS, at the time of the aforementioned unauthorized sale to Defendant, DOE 1.

331. Defendant, EDWARDS, had no authority to sell the “Miura" at the time of the aforementioned unauthorized sale to Defendant, DOE 1.

332. The current whereabouts of the “Miura” are unknown to Plaintiff.

333. Defendants, HAWKINS and SPECIALIST CARS, have represented that the “Miura” had not been sold as of October 12, 2015.

334. Defendants, HAWKINS and SPECIALIST CARS, have also represented that the "Miura" was at the premises maintained by Defendant, SPECIALIST CARS, on the evening of October 12, 2015.

335. Plaintiff relied on the various representations made by Defendants, HAWKINS and SPECIALIST CARS, concerning the potential and/or actual sale of the “Miura.”

336. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND and SWEENEY, conspired to commit overt acts to defraud Plaintiff out of the value of the “Miura” through wire fraud, mail fraud and additional criminal/illegal activities.

337. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND and SWEENEY, committed overt acts to defraud Plaintiff out of the value of the “Miura” through wire fraud, mail fraud and additional criminal/illegal activities.

338. Plaintiff has suffered damages relating to the “Miura” in the amount of $750,000.00, which was the approximate fair market value of the “Miura” at the time of Defendants’ fraud.

## FACTS
## (PORSCHE 2.7RS LIGHTWEIGHT - WHITE - S/N 3600878)

339. Defendant, EDWARDS, identified for Plaintiff a white Porsche 2.7RS Lightweight automobile (Chassis number 3600878) (hereinafter “Porsche Lightweight”) that was for sale in Belgium.

340. Defendant, EDWARDS, persuaded Plaintiff to purchase the “Porsche Lightweight.”

341. On or about March 29, 2014, Plaintiff agreed to purchase the “Porsche Lightweight” from LM Classic Cars located in Genk, Belgium.

342. On or about April 3, 2014, Plaintiff transmitted to LM Classic Cars the sum of €550,000, the amount he understood to be the full purchase price of the “Porsche Lightweight.”

343. Plaintiff paid the aforementioned sum of €550,000 in two (2) transfers to LM Classic Cars of £458,358 and £3,076.40 respectively.

344. By virtue of misrepresentations made to Plaintiff and the transmittal of a forged invoice, Defendant, WILLIAMS, solicited and received an unauthorized and undisclosed payment of €25,000 from the sale proceeds received by LM Classic Cars for the “Porsche Lightweight.”

345. Initially, Defendant, WILLIAMS, knowingly made material misrepresentations in an attempt to secure a fraudulent contract for the “Porsche Lightweight” in his own name.

346. As a result of Defendant, WILLIAMS', aforementioned conduct, a fraudulent contract was initially issued in Defendant, WILLIAMS’, name.

347. The aforementioned fraudulent contract was subsequently rescinded.

348. Defendants, EDWARDS and WILLIAMS, arranged for Plaintiff to receive a forged Bill of Sale, on the letterhead of LM Classic Cars, in an attempt to conceal the aforementioned fraudulent contract.

349. The aforementioned forged Bill of Sale contained a purchase price for the "Porsche Lightweight," which exceeded the actual purchase price to be paid to LM Classic Cars.

350. On information and belief, the aforementioned fraudulent contract and forged Bill of Sale were attempts to conceal the unauthorized payment of €25,000 received by Defendant, WILLIAMS, from Plaintiff's funds, which were intended to be applied solely to the actual purchase price of the "Porsche Lightweight."

351. On information and belief, Defendants, WILLIAMS and EDWARDS, used the aforementioned fraudulent contract and forged Bill of Sale in contemplation of a scheme to convert and sell the "Porsche Lightweight" for their own use and benefit.

352. LM Classic Cars confirmed that it sold the "Porsche Lightweight" to Plaintiff and that Plaintiff alone holds the title to the vehicle.

353. On or about April 28, 2014, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Porsche Lightweight." See "Exhibit P."

354. The aforementioned "SoR" stated that the "Porsche Lightweight" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf with a minimum value to be returned to Plaintiff of £750,000. See "Exhibit P."

355. On or about May 28, 2014, the "Porsche Lightweight" was transported from Paris to the United Kingdom by Straight Eight, at Plaintiff's sole cost and expense. See "Exhibit Q."

356. On or about September 25, 2014, Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that Defendant, SPECIALIST CARS, was "holding and selling [the "Porsche Lightweight" for Plaintiff]" and that Defendant, HAWKINS, "understands and… [would] abide by [Plaintiff's] wishes 100%" with regards to the "Porsche Lightweight." See "Exhibit K."

357. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff expressly advised Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, held no ownership interest in the "Porsche Lightweight" and possessed no authority to agree to its sale or transfer. See "Exhibit L."

358. On or about March 12, 2015, Plaintiff advised Defendants, HAWKINS and SPECIALIST CARS, that the "Porsche Lightweight" was "being held to [Plaintiff's] order and [could not] be sold or transferred without [his] specific authority."

359. On or about March 12, 2015, Defendants, HAWKINS and SPECIALIST CARS, once again expressly represented to Plaintiff that the "Porsche Lightweight" was being held at Defendant, SPECIALIST CARS', facility for the benefit of Plaintiff. See "Exhibit G."

360. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Porsche Lightweight" was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See "Exhibit G."

361. On or about August 10, 2015, Plaintiff, directly and through counsel, Fergus Buckley, explicitly advised Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, did not have any authority to sell, move or take possession of the "Porsche Lightweight." See "Exhibit H."

362. On or about August 10, 2015, Plaintiff, directly and through his attorney, Fergus Buckley, explicitly warned Defendants, HAWKINS and SPECIALIST CARS, not to turn over the “Porsche Lightweight” to Defendant, EDWARDS.

363. On or about September 14, 2015, Defendant, HAWKINS, reported to Plaintiff that Defendant, HAWKINS, was in negotiations to sell the "Porsche Lightweight" to one of his clients for a purchase price of £700,000.

364. By telephone on September 16, 2015, Defendant, HAWKINS, explained to Plaintiff's lawyer, Fergus Buckley, that Plaintiff could not collect the “Porsche Lightweight” because a sale of the car had been agreed to at a price of £665,000.

365. By email to Plaintiff's lawyer, Fergus Buckley, on September 18, 2015, Defendant, HAWKINS, confirmed that Defendant, SPECIALIST CARS, had issued a Sales Contract for the “Porsche Lightweight” to a client of Defendant, SPECIALIST CARS, for the price of £665,000.

366. The Sales Contract for the “Porsche Lightweight” described in Defendant, HAWKINS', September 18, 2015, email was never produced and never existed.

367. On information and belief, Defendant, HAWKINS', September 18, 2015, report of an issued Sales Contract for the “Porsche Lightweight” was a ruse intended to delay Plaintiff's recovery of that and the other Missing Cars Plaintiff had entrusted to Defendant, SPECIALIST CARS.

368. On October 12, 2015, Defendant, EDWARDS, removed the “Porsche Lightweight” from the facility maintained by Defendant, SPECIALIST CARS.

369. The turnover of the "Porsche Lightweight" to Defendant, EDWARDS, on October 12, 2015, was without Plaintiff's knowledge, approval and/or authority.

370. On October 12, 2015, after removing the "Porsche Lightweight" from Defendant, SPECIALIST CARS', facility, Defendant, EDWARDS, provided a note to Defendant, HAWKINS, which stated "I, Richard Edwards have collected all cars belonging to Mr. BJ Carl as Mr. Carl's agent." See "Exhibit R."

371. On information and belief, Defendant, HOWARTH, aided and abetted in the October 12, 2015, unauthorized removal of the "Porsche Lightweight" from Defendant, SPECIALIST CARS', facility. See "Exhibit M."

372. On information and belief, the "Porsche Lightweight" is one of the cars that Defendant, LIMBANI, assisted Defendant, EDWARDS, in transporting from the premises of Defendant SPECIALIST CARS, on October 12 and 13, 2015.

373. Since October 12, 2015, Defendant, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Porsche Lightweight" from Plaintiff, through the use of multiple false and misleading email correspondence.

374. Since October 12, 2015, Defendant, LIMBANI, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Porsche Lightweight" from Plaintiff, through his refusals to disclose its whereabouts.

375. On October 13, 2015, Defendant, EDWARDS, turned the "Porsche Lightweight" over to Defendants, SMITH and FOOS, for less than fair market value.

376. Defendant, EDWARDS, was not the owner of the "Porsche Lightweight" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

377. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the "Porsche Lightweight" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

378. Plaintiff had not entrusted the "Porsche Lightweight" to Defendant, EDWARDS, at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

379. Defendant, EDWARDS, had no authority to sell the "Porsche Lightweight" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

380. The "Porsche Lightweight" was a stolen car at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

381. Plaintiff is unaware of the current whereabouts of the "Porsche Lightweight."

382. Defendant, EDWARDS, has continued to solicit offers to purchase the "Porsche Lightweight" through December 2015.

383. Since October 13, 2015, Defendant, LIMBANI, has also offered the "Porsche Lightweight" for sale to European-based Porsche brokers and dealers.

384. Defendant, HAMANN, continued to advertise the "Porsche Lightweight" for sale at the behest and for the benefit of Defendant, EDWARDS, despite having been warned that a Court had ordered the return of the "Porsche Lightweight" to Plaintiff. <u>See</u> "Exhibit S."

385. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS, HOWARTH, LIMBANI, HAMANN, SMITH and FOOS, conspired to commit overt acts to defraud Plaintiff out of the value of the "Porsche Lightweight" through wire fraud, mail fraud and additional criminal/illegal activities.

386. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, WILLIAMS, HOWARTH, LIMBANI, HAMANN, SMITH and FOOS, committed overt acts to defraud Plaintiff out of the value of the "Porsche Lightweight" through wire fraud, mail fraud and additional criminal/illegal activities.

387. Upon information and belief, Plaintiff has suffered damages relating to the "Porsche Lightweight" in the amount of $1,250,000.00, which was the minimum value to be returned to Plaintiff that was agreed upon between Defendant, EDWARDS, and Defendants, HAWKINS and SPECIALIST CARS, for the "Porsche Lightweight" pursuant to the alleged "SoR." See "Exhibit P."

**FACTS**
**(PORSCHE 2.7RS TOURING - ORANGE - S/N 3600708)**

388. Defendant, EDWARDS, identified for Plaintiff an orange Porsche 2.7RS Touring automobile (Chassis number 3600708) (hereinafter "Porsche Touring-Orange") that was for sale in Belgium.

389. Defendant, EDWARDS, persuaded Plaintiff to purchase the "Porsche Touring-Orange."

390. On or about July 22, 2014, Plaintiff agreed to purchase the "Porsche Touring-Orange" from LM Classic Cars located in Genk, Belgium.

391. On or about July 22, 2014, Plaintiff arranged for Defendant, SPECIALIST CARS, to transmit the sum of €500,000 to LM Classic Cars, from the sums being held on Plaintiff's account, for the purchase of the "Porsche Touring-Orange," which amount Plaintiff understood to be the full purchase price of the vehicle.

392. On July 31, 2014, Defendant, HAWKINS, confirmed through an email correspondence to Plaintiff, that the above-referenced transfer of €500,000 had been completed on Plaintiff's behalf.

393. Defendant, WILLIAMS, had initially misrepresented Plaintiff's intentions and requested that the purchase contract for the "Porsche Touring-Orange" be in his company's name.

394. Upon information and belief, an initial contract was issued in the name of Defendant, WILLIAMS', company, Global.

395. The aforementioned fraudulent contract was subsequently rescinded.

396. Defendants, EDWARDS and WILLIAMS, arranged for Plaintiff to be sent a forged Bill of Sale, on the letterhead of LM Classic Cars, in an attempt to conceal the existence of the fraudulently obtained contract from Plaintiff.

397. On information and belief, Defendants, EDWARDS and WILLIAMS, entered into the fraudulent contract and issued the forged Bill of Sale in order to facilitate their plan to convert and sell the "Porsche Touring-Orange" for their own use and benefit.

398. LM Classic Cars has confirmed that it sold the "Porsche Touring-Orange" to Plaintiff and Plaintiff only on July 22, 2014.

399. On or about July 23, 2014, the "Porsche Touring-Orange" was transported by Straight Eight, from Paris to the United Kingdom, at Plaintiff's sole cost and expense. See "Exhibit T."

400. On or about September 8, 2014, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR")

agreement with Defendant, SPECIALIST CARS, for the "Porsche Touring-Orange." See "Exhibit U."

401. The aforementioned "SoR" stated that the "Porsche Touring-Orange" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf with a minimum value to be returned to Plaintiff of £625,000. See "Exhibit U."

402. On or about September 25, 2014, Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that Defendant, SPECIALIST CARS, was "holding and selling [the "Porsche Touring-Orange" for Plaintiff]" and that Defendant, HAWKINS, "understands and…[would] abide by [Plaintiff's] wishes 100%" with regards to the "Porsche Touring-Orange." See "Exhibit K."

403. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff expressly advised Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, held no ownership interest in the "Porsche Touring-Orange" and possessed no authority to agree to its sale or transfer. See "Exhibit L."

404. On or about March 12, 2015, Plaintiff advised Defendants, HAWKINS and SPECIALIST CARS, that the "Porsche Touring-Orange" was "being held to [Plaintiff's] order and [could not] be sold or transferred without [Plaintiff's] specific authority." See "Exhibit H."

405. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Porsche Touring-Orange" was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See "Exhibit G."

406. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through counsel, Fergus Buckley, expressly advised Defendants, HAWKINS and

SPECIALIST CARS, that Defendant, EDWARDS, did not have the authority to sell, move or take possession of the "Porsche Touring-Orange." See "Exhibit H."

407. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through his attorney, Fergus Buckley, expressly warned Defendants, HAWKINS and SPECIALIST CARS, that the "Porsche Touring-Orange" should not be turned over to Defendant, EDWARDS.

408. On or about September 14, 2015, Defendant, HAWKINS, reported to Plaintiff that Defendant, HAWKINS, was in negotiations to sell the "Porsche Touring-Orange" to one of his clients for the sum of £600,000.

409. By telephone on September 16, 2015, Defendant, HAWKINS, explained to Plaintiff's attorney, Fergus Buckley, that Plaintiff could not collect the "Porsche Touring-Orange" because a sale of the car had been agreed to at a price of £570,000.

410. By email to Plaintiff's lawyer, Fergus Buckley, on September 18, 2015, Defendant, HAWKINS, confirmed that Defendant, SPECIALIST CARS, had issued a Sales Contract for the "Porsche Touring-Orange" to a client of Defendant, SPECIALIST CARS, for the price of £570,000.

411. The aforementioned Sales Contract for the "Porsche Touring-Orange" described in Defendant, HAWKINS', September 18, 2015, email was never produced and never existed.

412. On information and belief, Defendant, HAWKINS', September 18, 2015, report of an issued Sales Contract for the "Porsche Touring-Orange" was a ruse intended to delay Plaintiff's recovery of the "Porsche Touring-Orange" and the other Missing Cars that Plaintiff had entrusted to Defendant, SPECIALIST CARS.

413. On October 12, 2015, Defendant, EDWARDS, removed the "Porsche Touring-Orange" from the facility maintained by Defendant, SPECIALIST CARS.

414. The turnover of the "Porsche Touring-Orange" was without Plaintiff's prior knowledge, approval and/or authority.

415. After removing the "Porsche Touring-Orange" from Defendant, SPECIALIST CARS', facility, Defendant, EDWARDS, provided a note to Defendant, HAWKINS, which stated "I, Richard Edwards have collected all cars belonging to Mr. BJ Carl as Mr. Carl's agent." See "Exhibit R."

416. On October 12, 2015, Defendant, HOWARTH, aided and abetted in the unauthorized removal of the "Porsche Touring-Orange" from the facility maintained by Defendant, SPECIALIST CARS. See "Exhibit M."

417. On information and belief, the "Porsche Touring-Orange" is one of the cars that Defendant, LIMBANI, assisted Defendant, EDWARDS, in transporting from the premises of Defendant, SPECIALIST CARS, on October 12 and 13, 2015.

418. Since October 12, 2015, Defendant, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Porsche Touring-Orange" from Plaintiff, through the use of false and misleading email correspondences.

419. Since October 12, 2015, Defendant, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Porsche Touring-Orange" from Plaintiff, through his refusal to disclose its whereabouts.

420. On October 13, 2015, Defendant, EDWARDS, turned the "Porsche Touring-Orange" over to Defendants, SMITH and FOOS, for less than fair market value.

421. Defendant, EDWARDS, was not the owner of the "Porsche Touring-Orange" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

422. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the "Porsche Touring-Orange" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

423. Plaintiff had not entrusted the "Porsche Touring-Orange" to Defendant, EDWARDS, at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

424. Defendant, EDWARDS, had no authority to sell the "Porsche Touring-Orange" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

425. The "Porsche Touring-Orange" was a stolen car at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

426. The current whereabouts of the "Porsche Touring-Orange" are currently unknown to Plaintiff.

427. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI, SMITH and FOOS, conspired to commit overt acts to defraud Plaintiff out of the value of the "Porsche Touring-Orange" through wire fraud, mail fraud and additional criminal/illegal activities.

428. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI, SMITH and FOOS, committed overt acts to defraud Plaintiff out of the value of the "Porsche Touring-Orange" through wire fraud, mail fraud and additional criminal/illegal activities.

429. Upon information and belief, Plaintiff has suffered damages relating to the "Porsche Touring-Orange" in the amount of $1,020,000.00, which was the minimum return to Plaintiff

agreed upon between Defendant, EDWARDS, and Defendants, HAWKINS and SPECIALIST CARS, for the "Porsche Touring-Orange" pursuant to the alleged "SoR." See "Exhibit U."

**FACTS**
**(PORSCHE 959 KOMFORT - BLACK - S/N HS900106)**

430. Defendant, EDWARDS, identified for Plaintiff a black Porsche 959 Komfort automobile (Chassis number HS900106) (hereinafter "Porsche 959") that was for sale in Germany.

431. Defendant, EDWARDS, persuaded Plaintiff to purchase the "Porsche 959."

432. In or around March 2014, Plaintiff agreed to purchase the "Porsche 959" from Dr. Norbert Hoffman in Karlsruhe, Germany.

433. In or about March 2014, Plaintiff transferred the sum of €350,000 to Dr. Norbert Hoffman, which Plaintiff understood to be the full purchase price for the "Porsche 959."

434. In or about March 2014, the "Porsche 959" was transported by Maintaler Auto Transporters from Germany to the United Kingdom, at Plaintiff's cost and expense.

435. In or about March or April 2014, Defendants, HAWKINS and SPECIALIST CARS, represented to Plaintiff that the "Porsche 959" was being held for Plaintiff at Defendant, SPECIALIST CARS', facility. See "Exhibit G."

436. On or about April 28, 2014, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Porsche 959." See "Exhibit V."

437. The aforementioned “SoR” stated that the “Porsche 959” was to be held at Defendant, SPECIALIST CARS’, facility and offered for sale on Plaintiff’s behalf with a minimum value to be returned to Plaintiff of £650,000. See “Exhibit V”

438. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the “Porsche 959” was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See “Exhibit G.”

439. On or about March 20, 2014, Defendant, SPECIALIST CARS, specifically confirmed to Plaintiff that it would hold the "Porsche 959" for Plaintiff and the car would not be released without Plaintiff's express permission.

440. On or about September 25, 2014, Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that Defendant, SPECIALIST CARS, was “holding and selling [the “Porsche 959” for Plaintiff]” and that Defendant, HAWKINS, “understands and…[would] abide by [Plaintiff’s] wishes 100%” with regards to the “Porsche 959.” See “Exhibit K.”

441. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff expressly advised Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, held no ownership interest in the “Porsche 959” and possessed no authority to agree to its sale or transfer. See “Exhibit L.”

442. On or about October 16, 2014, Plaintiff made a payment, pursuant to the Agreement, of £93,126 for the benefit of Defendant, EDWARDS.

443. Plaintiff tendered the foregoing payment to Defendant, EDWARDS, as his brokerage commission on the “Porsche 959” because Plaintiff had decided to keep the “Porsche 959”

for his personal collection rather than accept a purchase offer of approximately £550,000 that had been recommended by Defendants, EDWARDS and HAWKINS.

444. At Defendant, EDWARDS', direction, the payment was made for Defendant EDWARDS', benefit to Defendant, SCHOLES.

445. On information and belief, there was no firm offer received, in the form required by the Agreement, to purchase the "Porsche 959" for £550,000 in 2014.

446. On information and belief, the report of a £550,000 offer for the "Porsche 959" was a ruse employed by Defendants, EDWARDS and HAWKINS, to solicit the foregoing payment of £93,126 by fraud and misrepresentation.

447. On or about March 12, 2015, Plaintiff advised Defendants, HAWKINS and SPECIALIST CARS, that the "Porsche 959" was "being held to [Plaintiff's] order and [could not] be sold or transferred without [Plaintiff's] specific authority." See "Exhibit G."

448. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through counsel, Fergus Buckley, expressly advised Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, did not have the authority to sell, move or take possession of the "Porsche 959."

449. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through his attorney, Fergus Buckley, expressly warned Defendants, HAWKINS and SPECIALIST CARS, not to turn over the "Porsche 959" to Defendant, EDWARDS.

450. On or about August 19, 2015, Defendants, HAWKINS and SPECIALIST CARS, requested and received the title documents for the "Porsche 959" from Plaintiff's counsel, Fergus

Buckley, allegedly for the purpose of securing a road registration for the "Porsche 959" in Plaintiff's name. See "Exhibit W."

451. On or about September 13, 2015, Plaintiff reminded Defendant, HAWKINS, that the "Porsche 959" was a car he intended to keep for his personal collection rather than resell and that Defendant, EDWARDS, had no interest or expectation of further payments relating to this car.

452. Plaintiff received the original German title documents for the "Porsche 959" when he acquired that car.

453. The foregoing original title documents for the "Porsche 959" were held by Plaintiff's attorney, Fergus Buckley, until the summer of 2015.

454. In or about the late summer of 2015, Plaintiff's attorney, Fergus Buckley, delivered the original title documents for the "Porsche 959" to Defendants, HAWKINS and SPECIALIST CARS, at their request and with Plaintiff's approval, for the sole and specific purpose of obtaining a UK registration for the "Porsche 959" in Plaintiff's name.

455. The foregoing UK registration was never obtained.

456. On information and belief, the foregoing registration was never even applied for.

457. On October 12, 2015, Defendant, EDWARDS, claims to have removed the "Porsche 959" from the facility maintained by Defendant, SPECIALIST CARS.

458. Any turnover of the "Porsche 959" to Defendant, EDWARDS, was without Plaintiff's knowledge, approval and/or authority.

459. Defendant, HAWKINS, has represented that the title documents for the "Porsche 959", previously provided to Defendants, HAWKINS and SPECIALIST CARS, by Plaintiff's

counsel, Fergus Buckley, were inside the "Porsche 959" when it was removed from Defendant, SPECIALIST CARS', facility on October 12, 2015.

460. On information and belief, Defendant, HAWKINS', story of having left the original title documents inside the "Porsche 959" represents a material departure from normal and prudent practice within his industry.

461. On information and belief, Defendant, HAWKINS, requested the original title documents to secure the foregoing registration as a ruse to make it easier for the Defendants to undertake and complete an unauthorized sale of the "Porsche 959."

462. Defendants, EDWARDS and LIMBANI, have used the "Porsche 959" title documents, which were supplied to Defendant, HAWKINS, by Plaintiff's counsel, Fergus Buckley, to fraudulently market the "Porsche 959" to unsuspecting potential purchasers.

463. On October 12, 2015, after removing the "Porsche 959" from Defendant, SPECIALIST CARS', facility, Defendant, EDWARDS, provided a note to Defendant, HAWKINS, which stated "I, Richard Edwards have collected all cars belonging to Mr. BJ Carl as Mr. Carl's agent." See "Exhibit R."

464. On October 12, 2015, Defendant, HOWARTH, aided and abetted the unauthorized removal of the "Porsche 959" from the facility maintained by Defendant, SPECIALIST CARS. See "Exhibit M."

465. On information and belief, the "Porsche 959" is one of the cars Defendant, LIMBANI, assisted Defendant EDWARDS, in transporting, on October 12 and 13, 2015.

466. Since October 12, 2015, Defendant, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the “Porsche 959” from Plaintiff, through the use of false and misleading email correspondences.

467. Since October 12, 2015, Defendant, LIMBANI, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the “Porsche 959” from Plaintiff, through his refusal to disclose its whereabouts.

468. Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, maintain that, during the month of October 2015, the “Porsche 959” was at the facilities of Defendant, SPECIALIST CARS, removed from that site by Defendant, EDWARDS, immediately turned over to Defendant, SMITH, and then placed at a location unknown to Defendant, EDWARDS.

469. On October 13, 2015, Defendant, EDWARDS, turned over the “Porsche 959” to Defendants, SMITH and FOOS, for less than fair market value.

470. Defendant, EDWARDS, was not the owner of the “Porsche 959” at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

471. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the “Porsche 959” at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

472. Plaintiff had not entrusted the “Porsche 959” to Defendant, EDWARDS, at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

473. Defendant, EDWARDS, had no authority to sell the “Porsche 959” at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

474. The “Porsche 959” was a stolen car at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

475. On information and belief and contrary to the foregoing false and misleading representations by Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, during all or part of the month of October 2015, the "Porsche 959" was actually being stored in the basement of the facilities of Defendant, LANDMARK CAR, at the behest of Defendant, EDWARDS.

476. Contrary to Defendant, EDWARDS', false and misleading representations, during a significant part of the month of October 2015, the "Porsche 959" was actually being held for sale by Classic Worldwide Automobiles Ltd. at Armory Way, in the Wandsworth area of London, at the direction and for the account of Defendant, EDWARDS.

477. Defendant, EDWARDS, was continuing to market the "Porsche 959" for sale as late as December 2015.

478. The current whereabouts of the "Porsche 959" are currently unknown to Plaintiff.

479. Defendant, LIMBANI, was aware that the "Porsche 959" was the subject of an auto theft investigation as a result of an inquiry from the police on or about December 19, 2015.

480. Nonetheless, even after December 19, 2015, Defendant, LIMBANI, offered the "Porsche 959" to one or more European based Porsche brokers and/or dealers.

481. Defendant, LIMBANI, was on notice that the "Porsche 959" had been stolen prior to May 24, 2016.

482. Nonetheless, on or about May 24, 2015, Defendant, LIMBANI, in cooperation with his brother, Rishill Limbani and with his associate, Aman Thukrel, advertised the "Porsche 959" for sale on a dealer website named "Auto Trader."

483. On May 25, 2016, one of Defendant LIMBANI's, brothers, in a conversation at a site in or near Wembley (in the United Kingdom), confirmed that the "Porsche 959" was "readily to hand" and within the control of Defendant, LIMBANI.

484. Another of Defendant, LIMBANI's, brothers, Rishill Limbani, later represented that he and his brother, Defendant LIMBANI, were selling the "Porsche 959" as a broker for an Arab owner.

485. Then, Defendant, LIMBANI's, associate, Aman Thrukel, represented that he was acting with Defendant, LIMBANI, for the owner of the "Porsche 959", whose identity he could not disclose.

486. Each of the foregoing representations by Defendant, LIMBANI's, brothers and associate, were false and misleading when made.

487. Defendant, HAMANN, has continued to advertise the "Porsche 959" for sale at the behest and for the benefit of Defendant, EDWARDS, despite having been warned that a Court had ordered the return of the "Porsche 959" to Plaintiff. See "Exhibit S."

488. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI, HAMANN, SMITH and FOOS, conspired to commit overt acts to defraud Plaintiff out of the value of the "Porsche 959" through wire fraud, mail fraud and additional criminal/illegal activities.

489. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI, HAMANN, SMITH and FOOS, committed overt acts to defraud Plaintiff out of the value of the "Porsche 959" through wire fraud, mail fraud and additional criminal/illegal activities.

490. Upon information and belief, Plaintiff has suffered damages relating to the "Porsche 959" in the amount of $1,100,000.00, which was the minimum return to Plaintiff agreed upon between Defendant, EDWARDS, and Defendants, HAWKINS and SPECIALIST CARS, for the "Porsche 959" pursuant to the alleged "SoR." See "Exhibit V."

**FACTS**
**(FERRARI 365 GT 2+2 - RED - S/N 13167)**

491. Defendant, EDWARDS, identified for Plaintiff a red Ferrari 365 GT 2+2 automobile (Chassis number 13167) (hereinafter "Ferrari 365") that was for sale in France.

492. Defendant, EDWARDS, persuaded Plaintiff to purchase the "Ferrari 365."

493. On or about August 2014, Plaintiff agreed to purchase the "Ferrari 365" from OLOAP along with a Maserati Sebring motorcar, hereinafter described.

494. On or about September 10, 2014, Plaintiff transmitted to OLOAP what he understood to be the full purchase price of €195,000 for the "Ferrari 365" and Maserati Sebring, in the form of two (2) wire transfers in the amount of £123,999 to the seller, OLOAP and £32,560 to the account of Defendant, SWEENEY (doing business as Defendant, PHS), respectively.

495. The actual price paid to the seller (OLOAP) was €155,000.

496. Accordingly, Defendants, EDWARDS and SWEENEY, used fraud and misrepresentation to wrongfully divert €40,000 of the purchase price to their own use and benefit.

497. On or about October 16, 2014, the "Ferrari 365" was transported via Straight Eight, from France to the United Kingdom, at Plaintiff's sole cost and expense. See "Exhibit X."

498. On or about April 11, 2014, Defendant, EDWARDS, purporting to act on Plaintiff's behalf, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Ferrari 365." See "Exhibit Y."

499. The aforementioned "SoR" stated that the "Ferrari 365" was to be held at the Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf with a minimum return to Plaintiff of £165,000. See "Exhibit Y."

500. On or about March 12, 2015, Plaintiff advised Defendants, HAWKINS and SPECIALIST CARS, that the "Ferrari 365" was "being held to [Plaintiff's] order and [could not] be sold or transferred without [Plaintiff's] specific authority." See "Exhibit H."

501. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the "Ferrari 365" was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS', care. See "Exhibit G."

502. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff, directly and through counsel, Fergus Buckley, explicitly informed Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, did not have the authority to sell, move or take possession of the "Ferrari 365." See "Exhibit H."

503. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff explicitly informed Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, had no ownership interest in the "Ferrari 365" and had no authority to agree to its sale or transfer. See "Exhibit L."

504. In early 2015, Defendant, SPECIALIST CARS, had agreed to accept the "Ferrari 365" as a a partial trade on Plaintiff's prospective purchase of another vehicle at a trade-in value of £155,000, but the sale was never consummated.

505. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff, directly and through his attorney, Fergus Buckley, explicitly warned Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, did not have the authority to sell, move or take possession of the "Ferrari 365."

506. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff, directly and through his attorney, Fergus Buckley, explicitly warned Defendants, HAWKINS and SPECIALIST CARS, not to turn over the "Ferrari 365" to Defendant, EDWARDS.

507. On October 12, 2015, Defendant, EDWARDS, removed the "Ferrari 365" from the facility maintained by Defendant, SPECIALIST CARS.

508. The turnover of the "Ferrari 365" to Defendant, EDWARDS, was without Plaintiff's knowledge, approval and/or authority.

509. On October 12, 2015, after removing the "Ferrari 365" from Defendant, SPECIALIST CARS', facility, Defendant, EDWARDS, provided a note to Defendant, HAWKINS, which stated "I, Richard Edwards have collected all cars belonging to Mr. BJ Carl as Mr. Carl's agent." See "Exhibit R."

510. On information and belief, the "Ferrari 365" is one of the cars that Defendant, LIMBANI, assisted Defendant EDWARDS, in transporting from the premises of Defendant SPECIALIST CARS, on October 12 and 13, 2015.

511. On October 12, 2015, Defendants, HOWARTH and LIMBANI, aided and abetted in the unauthorized removal of the "Ferrari 365" from the facility maintained by Defendant, SPECIALIST CARS. See "Exhibit M."

512. Since October 12, 2015, Defendants, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Ferrari 365" from Plaintiff, through the use of false and misleading email correspondences.

513. Since October 12, 2015, Defendant, LIMBANI, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Ferrari 365" from Plaintiff, through his refusal to disclose its whereabouts.

514. On October 13, 2015, Defendant, EDWARDS, turned the "Ferrari 365" over to Defendants, SMITH and FOOS, for less than fair market value.

515. Defendant, EDWARDS, was not the owner of the "Ferrari 365" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

516. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the "Ferrari 365" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

517. Plaintiff had not entrusted the "Ferrari 365" to Defendant, EDWARDS, at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

518. Defendant, EDWARDS, had no authority to sell the "Ferrari 365" at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

519. The "Ferrari 365" was a stolen car at the time of the aforementioned unauthorized sale to Defendants, SMITH and FOOS.

520. The current whereabouts of the "Ferrari 365" are unknown to Plaintiff.

521. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI SMITH and FOOS, conspired to commit overt acts to defraud Plaintiff out of the value of the "Ferrari 365" through wire fraud, mail fraud and additional criminal/illegal activities.

522. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, LIMBANI SMITH and FOOS, committed overt acts to defraud Plaintiff out of the value of the "Ferrari 365" through wire fraud, mail fraud and additional criminal/illegal activities.

523. Upon information and belief, Plaintiff has suffered damages relating to the "Ferrari 365" in the amount of $275,000.00, which was the fair market value of the "Ferrari 365" at the time of the Defendants' fraudulent activity.

**FACTS**
**(ALFA ROMEO MONTREAL - RED - S/N 142762)**

524. Defendant, EDWARDS, identified for Plaintiff a red Alfa Romeo Montreal automobile (Chassis number 142762) (hereinafter "Montreal") that was for sale in France.

525. Defendant, EDWARDS, persuaded Plaintiff to purchase the "Montreal."

526. Defendant, EDWARDS, represented to Plaintiff that the seller of the "Montreal" was Defendant, LEFT HAND.

527. Plaintiff agreed to purchase the "Montreal" along with the "Miura," as herein-above described.

528. On or about December 2014, Defendants, EDWARDS and SCHOLES, solicited Plaintiff to provide a deposit for the purchase of the "Montreal" and "Miura" in the amount of €60,000.

529. Defendant, EDWARDS, directed Plaintiff to pay the €60,000 deposit to the account of Defendant, SCHOLES, (doing business as Defendant, LEFT HAND) at Currencies Direct in London.

530. On or about January 6, 2015, Plaintiff arranged for the payment of €60,000 as a deposit for the purchase of the "Montreal" and the "Miura" to be made to the account of Defendant, SCHOLES, at Currencies Direct in London.

531. On or about February 2, 2015, Plaintiff arranged for an additional payment in the amount of €46,650 to be made to Defendant, SPECIALIST CARS, in connection with Plaintiff's purchase of the "Montreal" and the "Miura."

532. On or about February 5, 2015, Plaintiff arranged for a final payment in the amount of €294,100 to be made to the account of Defendant, SCHOLES, at Currencies Direct in London, thereby completing Plaintiff's purchase of the "Montreal" and the "Miura."

533. On or about March 5, 2015, Defendant, EDWARDS, purporting to represent Plaintiff, but without Plaintiff's knowledge or consent, entered into a Sale or Return ("SoR") agreement with Defendant, SPECIALIST CARS, for the "Montreal." See "Exhibit Z."

534. The aforementioned "SoR" stated that the "Montreal" was to be held at Defendant, SPECIALIST CARS', facility and offered for sale on Plaintiff's behalf with a minimum value to be returned to Plaintiff of £15,000. See "Exhibit Z."

535. On or about March 12, 2015, Defendants, HAWKINS and SPECIALIST CARS, represented to Plaintiff that the "Montreal" was being held at Defendant, SPECIALIST CARS', facility for the benefit of Plaintiff.

536. Defendants, HAWKINS and SPECIALIST CARS, assured Plaintiff that the “Montreal” was being insured by Defendant, SPECIALIST CARS, while it was in Defendant, SPECIALIST CARS’, care.

537. On August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through counsel, Fergus Buckley, explicitly informed Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, did not have the authority to sell, move or take possession of the “Montreal.”

538. Beginning on August 10, 2015, and on multiple occasions thereafter, Plaintiff directly and through his attorney, Fergus Buckley, explicitly warned Defendants, HAWKINS and SPECIALIST CARS, not to turn over the “Montreal” to Defendant, EDWARDS.

539. Beginning on September 25, 2014, and on multiple occasions thereafter, Plaintiff explicitly informed Defendants, HAWKINS and SPECIALIST CARS, that Defendant, EDWARDS, had no ownership interest in the “Montreal” and had no authority to agree to its sale or transfer. See “Exhibit L.”

540. On October 12, 2015, Defendant, EDWARDS, removed the “Montreal” from the facility maintained by Defendant, SPECIALIST CARS.

541. The turnover of the “Montreal” to Defendant, EDWARDS, was without Plaintiff's knowledge, approval and/or authority.

542. On October 12, 2015, after removing the “Montreal” from Defendant, SPECIALIST CARS', facility, Defendant, EDWARDS, provided a note to Defendant, HAWKINS, which stated, “I, Richard Edwards have collected all cars belonging to Mr. BJ Carl as Mr. Carl's agent.” See “Exhibit R.”

543. On October 12, 2015, Defendant, HOWARTH, aided and abetted in the unauthorized removal of the "Montreal" from the facility maintained by Defendant, SPECIALIST CARS. See "Exhibit M."

544. Since October 12, 2015, Defendant, HOWARTH, has aided and abetted Defendant, EDWARDS, in concealing the whereabouts of the "Montreal" from Plaintiff, through the use of false and misleading email correspondences.

545. On October 13, 2015, Defendant, EDWARDS, claims to have turned the "Montreal" over to Defendants, SMITH and FOOS, for less than fair market value.

546. On another occasion, Defendant, EDWARDS, represented that, by October 12, 2015, he had already sold the "Montreal" (along with the "Miura") to Defendant DOE 1.

547. Defendant, EDWARDS, was not the owner of the "Montreal" at the time of the unauthorized sales to Defendants, DOE 1 or SMITH and FOOS.

548. Plaintiff had not vested Defendant, EDWARDS, with any ownership interest in the "Montreal" at the time of the aforementioned unauthorized sales to Defendants, DOE 1 or SMITH and FOOS.

549. Plaintiff had not entrusted the "Montreal" to Defendant, EDWARDS, at the time of the aforementioned unauthorized sales to Defendants, DOE 1 or SMITH and FOOS.

550. Defendant, EDWARDS, had no authority to sell the "Montreal" at the time of the aforementioned unauthorized sales to Defendants, DOE 1 or SMITH and FOOS.

551. The "Montreal" was a stolen car at the time of the aforementioned unauthorized sales to Defendants, DOE 1 or SMITH and FOOS.

552. The current whereabouts of the "Montreal" are unknown to Plaintiff.

553. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, SMITH, FOOS and DOE 1, conspired to commit overt acts to defraud Plaintiff out of the value of the "Montreal" through wire fraud, mail fraud and additional criminal/illegal activities.

554. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, HOWARTH, SMITH, FOOS and DOE 1, committed overt acts to defraud Plaintiff out of the value of the "Montreal" through wire fraud, mail fraud and additional criminal/illegal activities.

555. Plaintiff has suffered damages relating to the "Montreal" in the amount of at least $22,000.00, which was the fair market value of the "Montreal" at the time of the Defendants' fraudulent activity.

**FACTS**
**(PORSCHE 356 SPEEDSTER - GREY - S/N 6889/61/1)**

556. In addition to the Missing Cars, Defendant, EDWARDS, persuaded Plaintiff to purchase a rare, right-hand-drive, grey Porsche 356 Speedster (Chassis number 68893/61/1) (hereinafter "Porsche Speedster") from a seller in Australia.

557. The "Porsche Speedster" was the first car purchased by Plaintiff pursuant to the Agreement.

558. On or about June 15, 2015, Defendant, LANDMARK CAR, entered into an agreement to purchase the "Porsche Speedster" from Plaintiff for the sum of £275,000. See "Exhibit AA."

559. Defendant, LANDMARK CAR, did not complete the purchase and requested that Plaintiff allow Defendant, LANDMARK CAR, to sell the "Porsche Speedster" on consignment to return a minimum of £275,000 to Plaintiff.

560. In or around July 2015, Plaintiff agreed to allow Defendant, LANDMARK CAR, to defer the purchase of the "Porsche Speedster" and instead allowed them to sell the "Porsche Speedster" to return the same £275,000 to Plaintiff.

561. The consignment agreement stated, inter alia, that Defendant, LANDMARK CAR, was to make available to Plaintiff a non-interest bearing advance of £200,000 while holding the "Porsche Speedster" for sale.

562. The requested advance of £200,000 was provided to Plaintiff, as agreed.

563. On or about late July, 2015, Defendant, PATTINSON, acting on behalf of Defendant, LANDMARK CAR, asked for a return of the £200,000 advance made with regards to the "Porsche Speedster."

564. Plaintiff advised Defendants, PATTINSON and LANDMARK CAR, that the £200,000 advance would be repaid upon the return of the "Porsche Speedster" to Plaintiff.

565. Defendant, PATTINSON, acting on behalf of Defendant, LANDMARK CAR, responded that Defendant, LANDMARK CAR, would prefer to retain the "Porsche Speedster" on consignment and await repayment of the advance from the sale proceeds due to Plaintiff.

566. As late as December 8, 2015, Defendant, EDWARDS, was continuing to assert that Defendant, LANDMARK CAR, was still demanding repayment of the £200,000 advance paid regarding the "Porsche Speedster," but without being willing to return the "Porsche Speedster" to Plaintiff.

567. On or about December 2015, Plaintiff reiterated his offer to repay the £200,000 advance made by Defendant, LANDMARK CAR, in connection with the consignment of the "Porsche Speedster" upon the return of the "Porsche Speedster" to Plaintiff.

568. To date, Defendants, PATTINSON and LANDMARK CAR, are refusing to accept Plaintiff's repayment offer and are refusing to return the "Porsche Speedster" as agreed.

569. On information and belief, Defendants, PATTINSON and LANDMARK CAR, are refusing to return the "Porsche Speedster" to Plaintiff in cooperation with Defendant, EDWARDS, and as a part of the overall conspiracy to defraud Plaintiff, as alleged herein.

570. Defendants, EDWARDS, PATTINSON and LANDMARK CAR, conspired to commit overt acts to defraud Plaintiff out of the value of the "Porsche Speedster" through wire fraud, mail fraud and additional criminal/illegal activities.

571. Defendants, EDWARDS, PATTINSON and LANDMARK CAR, committed overt acts to defraud Plaintiff out of the value of the "Porsche Speedster" through wire fraud, mail fraud and additional criminal/illegal activities.

572. Upon information and belief, Plaintiff has suffered damages relating to the "Porsche Speedster" in the amount of at least $110,000.00, which was the difference between the fair market value of the "Porsche Speedster" and the advance paid to Plaintiff at the time of the Defendants' fraudulent activity.

## FACTS
## (FERRARI F40 - s/n ZFFG J35B 000 83587)

573. In addition to the Missing Cars, Defendant, EDWARDS, persuaded Plaintiff to purchase a second Ferrari F40 (Chassis number ZFFG J35B 0000 83587) (hereinafter the "Dutch F40") from a seller in the Netherlands.

574. Defendant, EDWARDS, advised Plaintiff to pay the sum of €685,000 to the account of the seller FMV_NV for the "Dutch F40."

575. On or about September 30, 2014, Plaintiff arranged for a payment of €685,000 for the purchase of the "Dutch F40" to be made to the account of the seller.

576. The “Dutch F40” was subsequently transported to the premises of Defendant, SPECIALIST CARS, to be held for the benefit of Plaintiff.

577. In early March 2015, Defendant, EDWARDS, negotiated the sale of the “Dutch F40” to Blackbird Automotive Ltd., through its representative Andrew Turner.

578. On March 5, 2015, the buyer’s representative sent an email correspondence to Defendant, EDWARDS, confirming his client’s agreement to purchase the "Dutch F40” for “£755,000 and the balance in cash.”

579. On or about March 5, 2015, Defendant, EDWARDS, conveyed Blackbird Automotive Ltd.’s proposal to purchase the “Dutch F40” to Plaintiff, but failed to disclose the “cash balance” portion of the purchase price.

580. Defendants, EDWARDS and HAWKINS, represented to Plaintiff that the proposed sale of the “Dutch F40” to Blackbird Automotive Ltd., was for the sum of £755,000.

581. In reliance upon the aforementioned representations and in accordance with the terms of the Agreement between Plaintiff and Defendant, EDWARDS, Plaintiff approved the proposed sale to Blackbird Automotive Ltd.

582. Unbeknownst to Plaintiff, on March 6, 2015, Defendant, EDWARDS, had instructed Defendants, HAWKINS and SPECIALIST CARS, to prepare a false invoice for the “Dutch F40” listing a sale price of £755,000 (approximately $1,121,000), but with “No mention of cash!”

583. Defendants, HAWKINS and SPECIALIST CARS, duly provided Plaintiff with a copy of an invoice, dated March 6, 2015, for the purchase/sale of the "Dutch F40" with a listed sale price of £755,000 (approximately $1,121,000.00). See "Exhibit BB."

584. On or about March 10, 2015, Blackbird Automotive Ltd. subsequently transferred the sum of £755,000 (approximately $1,121,000.00), the non-cash portion of the purchase price, to Defendant, SPECIALIST CARS, but the receipt of these funds was not reported to Plaintiff for nearly a month.

585. On or about April 14, 2015, Defendant, HAWKINS, sent an email correspondence to Plaintiff, which reported that the "Dutch F40" had actually been sold for only £750,000 (approximately $1,114,000).

586. On April 14, 2015, Defendant, HAWKINS, reported to Plaintiff that he had, that day, transferred the purchase price for the "Dutch F40" to Plaintiff.

587. On April 20, 2015, Plaintiff received the sum of $750,00.00 (approximately £500,000) in payment for the "Dutch F40."

588. Plaintiff has repeatedly requested payment of or an accounting for the difference between the sale price of £755,000 and the approximately £500,000 transmitted to Plaintiff, but has not received a reply to date.

589. Defendants, HAWKINS and SPECIALIST CARS, have subsequently acknowledged that the actual purchase price of the "Dutch F40" was at least £775,000.

590. It remains unknown whether this reported £775,000 purchase price actually includes the entire cash portion of the purchase price that Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, had conspired to conceal form Plaintiff.

591. The total amount received by Plaintiff for the sale of the “Dutch F40” is less than 2/3 of the £775,000 that Defendants, HAWKINS and SPECIALIST CARS, now claim to have received from the buyer of the “Dutch F40” — a shortfall of approximately $500,000.00.

592. On information and belief, a portion of the purchase price received for the sale of the “Dutch F40” was paid to Defendant, SCHOLES.

593. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, conspired to commit overt acts to defraud Plaintiff out of the value of the “Dutch F40” through wire fraud, mail fraud and additional criminal/illegal activities.

594. Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, committed overt acts to defraud Plaintiff out of the value of the “Dutch F40” through wire fraud, mail fraud and additional criminal/illegal activities.

595. Defendants, EDWARDS, HAWKINS and SPECIALIST CARS, conspired to conceal and convert a portion of the purchase price for the “Dutch F40” from Plaintiff, thereby depriving Plaintiff of the full benefit of the sale of this car.

596. As a result of the foregoing fraudulent actions of Defendants, EDWARDS, HAWKINS, SPECIALIST CARS and SCHOLES, Plaintiff has suffered damages in excess of $500,000.00.

## FACTS
## (PORSCHE GT1 and PORSCHE 959)

597. Defendant, EDWARDS, identified a Porsche GT 1 (s/n WPOZZZ99ZWS396500) and a Porsche 959 (s/n WPDZZZ9SZJS900138) (hereinafter “Dubai Porsches”) for Plaintiff to purchase from Defendant, DOE 2, in Dubai.

598. Defendant, EDWARDS, persuaded Plaintiff to purchase the “Dubai Porsches” from their seller, Defendant, DOE 2.

599. Defendant, EDWARDS, requested that Plaintiff pay €165,000 as a deposit for the “Dubai Porsches” to an agent for the Defendant, DOE 2.

600. At the urging of Defendants, EDWARDS and HAWKINS, on or about June 4, 2014, Plaintiff arranged for the payment of the aforesaid €165,000 deposit to the agent of Defendant, DOE 2, for the purchase of the “Dubai Porsches.”

601. On information and belief, the foregoing €165,000 deposit was shared by Defendants WILLIAMS, DOE 2 and others.

602. Plaintiff was entirely unaware of Defendant, WILLIAMS’, role in this transaction.

603. On information and belief, the “Dubai Porsches” were not actually for sale and the transaction proposed and represented to Plaintiff by Defendants, EDWARDS and HAWKINS, could never have been consummated.

604. Despite multiple demands, Plaintiff’s deposit has not been refunded.

605. On information and belief, Plaintiff’s deposit was diverted by Defendants, EDWARDS, HAWKINS and WILLIAMS, to other uses, rather than to its intended use as a deposit on the purchase of the “Dubai Porsches.”

606. As a result of Defendants, EDWARDS', HAWKINS' and WILLIAMS’, fraudulent activities, Plaintiff has sustained damages in the amount of no less than $188,017.50.

607. In addition, as a result of Defendants, EDWARDS', HAWKINS' and WILLIAMS’, fraudulent activity, Plaintiff has suffered the loss of profits implicit in his purchase of the

"Dubai Porsches" as compared to their respective market values at the time Plaintiff's deposit was received by Defendants, DOE 2 and WILLIAMS.

608. The resulting opportunity loss caused by the foregoing fraud is in excess of $750,000.00.

609. As a result of Defendants, EDWARDS', HAWKINS', WILLIAMS' and DOE 2's, conspiracy to defraud Plaintiff, Plaintiff has sustained damages in the amount of no less than $938,017.50.

**FACTS**
**(ALPHA ROMEO 8C ZAGATO)**

610. Defendant, EDWARDS, solicited Plaintiff to enter into one purchase transaction prior to execution of the Agreement.

611. In or about February 2012, prior to entering into the Agreement, Defendant, EDWARDS, solicited Plaintiff to purchase a 1932 Alfa Romeo 8C Zagato (hereinafter "8C Zagato").

612. Plaintiff declined the offer to purchase the "8C Zagato" that had been presented by Defendant, EDWARDS.

613. Defendant, EDWARDS, then requested that Plaintiff provide him with a loan in order to facilitate Defendant, EDWARDS', purchase of the "8C Zagato," to which Plaintiff again declined.

614. Defendant, EDWARDS, subsequently explained that the "8C Zagato" was being purchased by his wife, Lorna Edwards, through a broker, who was Defendant, WILLIAMS.

615. Defendant, EDWARDS, solicited Plaintiff to provide a short-term loan of £221,000 to his wife, Lorna Edwards, allegedly as part of a complex commercial arrangement, which included the refinancing of Mrs. Edwards' apartment and the payoff of a loan from a third-

party lender named Consolidated Steel Products that had been secured to finance Defendant, EDWARDS', acquisition of the "8C Zagato."

616. In order to secure Plaintiff's agreement to make the foregoing short-term loan, Defendants, EDWARDS and WILLIAMS, provided Plaintiff with documentation to show that the "8C Zagato" was an original 1930's era Italian car (although, perhaps, later rebodied) and would come with original Italian registration documents from its owner.

617. In order to secure Plaintiff's agreement to make the foregoing short-term loan, Defendants, EDWARDS and WILLIAMS, also provided Plaintiff (and other potential lenders/investors) with documentation (including forged emails) to show that Defendants EDWARDS and WILLIAMS had already invested more than $4 million in the acquisition of the "8C Zagato."

618. The "8C Zagato" described by Defendants, EDWARDS and WILLIAMS, would have had a market value in excess of $6,000,000.00.

619. Defendant, WILLIAMS, allegedly raised a total of $600,000.00, through loans from investors like Plaintiff, to pay the purchase price of the "8C Zagato."

620. The car actually purchased by Defendants, EDWARDS and WILLIAMS, was merely a replica, created in Argentina, that contained no meaningful parts from any original 1930's vintage Alfa Romeo 8C Zagato.

621. Defendants, EDWARDS and WILLIAMS, were aware that the vehicle was a replica when soliciting loans and investments from Plaintiff and others.

622. The funds solicited by Defendants, EDWARDS and WILLIAMS, were merely intended to fund Defendants, EDWARDS', WILLIAMS' and their respective spouses' debt obligations.

623. Some of the documents provided to Plaintiff and other investors by Defendants, EDWARDS and WILLIAMS, to prove the authenticity of the "8C Zagato" were forgeries.

624. Some of the email correspondence used by Defendants, EDWARDS and WILLIAMS, to market the "8C Zagato" as an original 1930's car were from a fictitious email account created to mislead potential investors and/or others.

625. On information and belief, the aforementioned forged documents and fictitious email accounts were created by Defendant, WILLIAMS, or by members of his immediate family.

626. Defendants, EDWARDS and WILLIAMS, represented to Plaintiff that the "8C Zagato" was being sold by its then owner for an amount in excess of $600,000.00.

627. In fact, the owner of the "8C Zagato" was paid less than $350,000.00.

628. The remaining approximately $250,000.00 that Defendant, WILLIAMS, received from investors (or lenders to its acquisition) was deposited by Defendant, WILLIAMS, in an account maintained under a fictitious name at a financial institution (Bank of Andorra), which has subsequently been shuttered due to multiple money laundering transgressions.

629. In reliance upon the false and misleading documents and representations provided by Defendants, EDWARDS and WILLIAMS, as well as on the independent credit of Mrs. Edwards, Plaintiff eventually made a £221,000 short-term loan to Mrs. Edwards.

630. Plaintiff disbursed the proceeds of his loan to Mrs. Edwards by a wire transfer made at her direction.

631. When Plaintiff demanded repayment of his loan to Mrs. Edwards, she tendered to Plaintiff a personal check in the amount of the principal balance of the loan.

632. Mrs. Edwards's personal check was dishonored by her bank for insufficient funds.

633. To date, Mrs. Edwards has made no effort to make good on her dishonored check.

634. Plaintiff anticipates a substantial loss on the foregoing loan. Plaintiff's loss is caused in significant part by the false, misleading and fraudulent representations made by Defendants, EDWARDS and WILLIAMS, in the execution of their money laundering activity.

635. Defendants, EDWARDS and WILLIAMS, were aware of the true history of the "8C Zagato" and were active participants in the efforts to misrepresent the car to Plaintiff and other investors.

636. As a result of the aforementioned wire fraud, mail fraud and money laundering activities of Defendants, EDWARDS and WILLIAMS, Plaintiff has suffered and will continue to suffer pecuniary damages in the amount of no less than $313,918.00.

## COUNT I
## (VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT, 18 U.SC. §§ 1962(C) AND 1962(d)*)*
## (Against All Defendants)

637. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 636 as though fully set forth herein at length.

638. At all relevant times, Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

639. At all relevant times, each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

640. At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted affairs of an associated-in-fact enterprise (hereinafter "Enterprise") identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

641. Furthermore, in violation of 18 U.S.C. § 1962(d), Defendants knowingly agreed and conspired to conduct or participate in the conduct of said Enterprise's affairs through a pattern of racketeering activity.

642. The Enterprise had a hierarchical decision-making structure headed by Defendants, EDWARDS and HAWKINS. One or both of these individuals directed how the scheme was to be perpetrated.

643. The RICO Enterprise is an associated-in-fact enterprise, consisting of, at a minimum, Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, SWEENEY, PHS, HOWARTH, WILLIAMS, LIMBANI, HAMANN, SMITH, FOOS, PATTINSON, LANDMARK CAR, DOE 1, DOE 2 and UNKNOWN CO-CONSPIRATORS (the "Enterprise").

644. The purpose of the Enterprise was to perpetrate a scheme targeting Plaintiff and others in order to defraud them out of money and rare vintage automobiles.

645. The fraudulent and illegal actions undertaken by the Enterprise was intended to inflict the type of injury and harm suffered by the Plaintiff.

646. The Enterprise is an ongoing and continuing business organization consisting of corporations and individuals that are and have been associated for the common shared purpose of, among other things, (1) defrauding Plaintiff by accepting purchase money for one or more vintage cars and then unlawfully diverting those funds for their own use and benefit; (2) defrauding Plaintiff by unlawfully obtaining access to and converting rare vintage automobiles for their own economic gain; (3) compromising Plaintiff's right to use and enjoyment of the rare vintage automobiles Plaintiff had purchased; (4) concealing their ill-

gotten gains by committing a series of money laundering schemes; (5) carrying out these illegal and criminal acts through a surreptitious money laundering campaign; and (6) unlawfully carrying out an elaborate scheme, through deceptive, false and intentionally misleading communications to defraud Plaintiff out of large sums of money.

647. At all relevant times, on information and belief, Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, SWEENEY, PHS, HOWARTH, WILLIAMS, LIMBANI, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1, DOE 2 and the UNKNOWN CO-CONSPIRATORS, were aware of each other's conduct in furtherance of the scheme, and were knowing and willing participants in that conduct.

648. At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

649. The Enterprise affected interstate commerce by purportedly conducting purchase and sale transactions throughout the United States and abroad using fraudulent, deceptive and knowingly misleading communications sent across state lines and/or to the United States from international locations, all of which were intended to fraudulently induce Plaintiff into participating in non-existent and/or fraudulent transactions, and by sending and receiving fraudulently obtained sums of money throughout the United States and across international boarders.

650. At all relevant times, the Defendants conducted or participated, directly or indirectly, in the conduct, management, operation and/or cover-up of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1962(c).

651. Defendants have exerted control over the Enterprise and, in violation of section 1962(c), Defendants have conducted or participated in the affairs of the RICO Enterprise in at least the following ways:

a. By creating and disseminating false and misleading documents and solicitations concerning rare vintage automobiles which were unavailable and/or did not exist;

b. By making false and misleading representations to Plaintiff concerning the purchase, storage, and resale of multiple rare vintage automobiles;

c. By making false and misleading representations to Plaintiff regarding the reasons why the Enterprise and/or its participants could not turn over possession of the rare vintage vehicles Plaintiff had purportedly already purchased;

d. By making false and misleading statements concerning the existence, whereabouts, and condition of multiple rare vintage automobiles purchased by Plaintiff;

e. By making false and misleading statements to Plaintiff in an attempt to conceal and cover-up the ongoing fraud and racketeering activities of the Enterprise;

f. By engaging in an ongoing campaign to defraud Plaintiff out of large sums of money and surreptitiously launder the fraudulently obtained funds in violation of US and International law.

652. The Enterprise engaged in a pattern of racketeering activity, consisting of, among other crimes, money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), transportation of stolen goods in interstate or foreign commerce (18 U.S.C. § 2314), transportation of stolen vehicles (18 U.S.C. § 2312), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), foreign travel or transportation in aid of racketeering enterprise (18 U.S.C. § 1952), and theft from interstate shipments (18 U.S.C. § 659).

653. The racketeering activities of Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, SWEENEY, PHS, HOWARTH, LIMBANI, WILLIAMS,

PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1, DOE 2 and their UNKNOWN CO-CONSPIRATORS, amounted to a common course of conduct, with similar pattern and purpose. Each separate criminal act and/or use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victim/victims, including Plaintiff.

654. Defendants, knowing that the funds, vehicles, and titles exchanged, wired, and transferred through the Enterprise's transactions represented the proceeds of some form of unlawful activity, conducted or attempted to conduct such transactions which in fact involved the proceeds of their continuing criminal Enterprise. 18 U.S.C. § 1956(a)(1)(A).

655. In addition, the Defendants knew that the transactions were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the continuing criminal Enterprise's unlawful activity. 18 U.S.C. § 1956(a)(1)(B).

656. The Enterprise, by and through the individual Defendants, transported, transmitted, transferred, or attempted to transport, transmit, or transfer funds and/or titles to vehicles from a place in the United States to or through a place outside of the United States or through a place outside of the United States to a place within the United States with the intent to promote the carrying on of the continuous criminal Enterprise and/or to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of the criminal Enterprise's unlawful activity. 18 U.S.C. §§ 1956 (a)(2)(A) and 1956(a)(2)(B).

657. In carrying out the Enterprise’s scheme, Defendants traveled in foreign commerce and/or used foreign commerce facilities with the intent to distribute the proceeds of the Enterprise's unlawful activity and/or to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of said unlawful activity. Subsequently, Defendants did or attempted to distribute the proceeds of the Enterprise's unlawful activity and/or promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of said unlawful activity. 18 U.S.C. §§ 1952 (a)(1) and 1952(a)(3).

658. In carrying out the Enterprise's scheme, Defendants transported in interstate and/or foreign commerce motor vehicles, the Missing Cars, knowing same to have been stolen in violation of 18 U.S.C. § 2312.

659. In carrying out the Enterprise's scheme, Defendants transported, transmitted, or transferred in interstate or foreign commerce money and vehicles belonging to Plaintiff, which had a value in excess of $5,000.00, with knowledge that same had been stolen, converted or taken by fraud.

660. In carrying out the Enterprise's scheme, Defendants, having devised or intended to devise a scheme or artifice to defraud Plaintiff, or to obtain money or vehicles from Plaintiff by means of false or fraudulent pretenses, representations, or promises, Defendants transported or caused to be transported, or induced another person to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud Plaintiff of his money and/or vehicles, which have a value in excess of $5,000.00. 18 U.S.C. § 2314.

661. Defendants, having devised or intending to devise a scheme or artifice to defraud Plaintiff, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises from Plaintiff, transmitted or caused to be transmitted writings, pictures, signs, and sounds, by means of wire, radio, and/or television communication in interstate and/or foreign commerce, for the purpose of executing the Enterprise's unlawful scheme. 18 U.S.C. § 1343.

662. Defendants, having devised and/or attempted to devise a scheme to defraud Plaintiff out of money and the Missing Cars, used the U.S. mails, common carriers, commercial interstate carriers, or some other form of delivery service for the purpose of executing their unlawful scheme. 18 U.S.C. § 1341.

663. The aforementioned correspondences, emails and wire transmissions were sent for (1) the purpose of deceiving and defrauding Plaintiff into believing that the Enterprise was a legitimate rare car procurement and brokerage organization, (2) to fraudulently induce Plaintiff to enter into transactions which did not exist, (3) to fraudulently induce Plaintiff to abstain from taking any legal action, (4) to deceive Plaintiff into believing the vehicles he purchased were being held to Plaintiff's order and were being handled in accordance with his instructions, and (5) to deceptively induce Plaintiff into entering into additional fraudulent transactions.

664. Defendants also produced, transferred and possessed, with the intent to use, false title documents, false financial documents, false insurance documents and false inventory manifests, all intended to assist in carrying out and prolonging the fraudulent scheme against Plaintiff.

665. Defendants, in furtherance of the Enterprise's fraudulent/unlawful scheme, obstructed, delayed and/or affected commerce or attempted or conspired to do so, through the use and/or threat of physical violence. 18 U.S.C. § 1951(a).

666. Plaintiff has sustained injury to his personal finances and property by reason of the Federal and State Law violations carried out by Defendants. Plaintiff has incurred financial losses as a direct result of Defendants' fraudulent conduct, including the out-of-pocket consequential losses, the cost of hiring private investigators and professional asset recovery specialists, the costs related to responding to multiple international law enforcement investigations, the costs of obtaining legal counsel in multiple countries to protect his rights, and the costs of re-establishing Plaintiff's good reputation throughout the specialized rare automobile enthusiast community. Plaintiff was a primary intended victim of Defendants' multi-year scheme and the injuries suffered by Plaintiff were both foreseeable and a natural consequence of Defendants' actions.

667. Under the provisions of section 1964(c) of RICO, each Defendant is jointly and severally liable for three times the damages that Plaintiff has sustained, plus the costs of bringing this lawsuit, including reasonable attorneys' fees.

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for damages, treble damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

## COUNT II
### (CONSPIRACY TO VIOLATE RICO, VIOLATION of 18 U.S.C. § 1962(d))
### (Against All Defendants)

668. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 667 as though fully set forth herein at length.

669. Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and/or agreed together and with others to defraud Plaintiff and to injure Plaintiff with a pattern of fraudulent and malicious conduct, in violation of 18 U.S.C. § 1962(d).

670. Upon information and belief, Defendants knew that they were engaged in a conspiracy to commit predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 10 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

671. Upon information and belief, the Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

672. Each Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiff. It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

673. As a direct and proximate result of Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18

U.S.C. § 1962(d), Plaintiff has suffered significant pecuniary injury and injury to his reputation and good standing in the vintage automobile collector community.

674. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, plus costs and attorneys' fees from the Defendants.

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for damages, treble damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

**COUNT III**
**(CIVIL CONSPIRACY)**
**(Against All Defendants)**

675. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 674 as though fully set forth herein at length.

676. Defendants and Defendants' co-conspirators knowingly and willfully conspired and/or agreed among themselves to defraud Plaintiff and to injure Plaintiff with a pattern of fraudulent and malicious conduct, including but not limited to:

a. By creating and disseminating to Plaintiff false and misleading documents and solicitations for rare vintage automobiles which were unavailable and/or did not exist;

b. By making false and misleading representations to Plaintiff concerning the purchase, storage, and resale of multiple rare vintage automobiles;

c. By making false and misleading representations to Plaintiff regarding the reasons why the Enterprise and/or its participants could not turn over possession of the rare vintage vehicles Plaintiff had purportedly already purchased;

d. By making false and misleading statements concerning the existence, whereabouts, and condition of multiple rare vintage automobiles purchased by Plaintiff;

e. By making false and misleading statements to Plaintiff in an attempt to conceal and cover-up the ongoing fraud and racketeering activities of the Enterprise;

f. By engaging in an ongoing campaign to defraud Plaintiff out of large sums of money and surreptitiously launder the fraudulently obtained funds in violation of US and International law.

677. As a direct and proximate result of the wrongful acts herein alleged, Plaintiff has diverted and expended substantial resources to address the consequences of Defendants' fraud, thereby adding to the substantial pecuniary loss already suffered by Plaintiff.

678. That at all times material hereto, Defendants and Defendants' co-conspirators committed the acts herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged fraudulent scheme. Defendants' conduct constitutes malicious, gross, wanton and willful wrongdoing as defined by the Courts of New York State, as Defendants fraudulently induced Plaintiff to transfer significant sums of money to Defendants on the false premise that the funds were to be used to purchase vintage automobiles on Plaintiff's behalf. *See* Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986).

679. Defendants' actions further constitute willfully or wantonly negligent conduct, as defined under New York Law. *See* Fordham-Coleman v. Nat'l Fuel Gas Distribution Corp., 42 A.D. 3d 106, 113, 834 NYS.2d 422, 428 (4th Dept. 2007).

680. Thus, in light of the foregoing relevant New York State Law and the Defendants' conduct as herein described, punitive damages are appropriate to punish Defendants and deter others from engaging in similar fraudulent misconduct.

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for consequential damages, punitive damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

**COUNT IV**
**(FRAUDULENT MISREPRESENTATION)**
**(Against All Defendants)**

681. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 680 as though fully set forth herein at length.

682. Defendants have made numerous false representations to Plaintiff in order to persuade Plaintiff to enter into transactions for the purchase and sale of the aforementioned vintage automobiles, which are the subject of this suit, including: (a) Defendants created false title and ownership documentation and false purchase orders; (b) Defendants sent Plaintiff false correspondences concerning the whereabouts and condition of the subject automobiles; and (c) Defendants made numerous false statements to Plaintiff concerning the status of the subject automobiles, in order to convince Plaintiff to transfer funds for the purpose of purchasing the subject automobiles, and subsequently in order to conceal the true status of the automobiles from Plaintiff.

683. Defendants made these representations with knowledge of their falsity and with the intent to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on the representations in the manner herein alleged, or with the expectation that Plaintiff would so act.

684. Plaintiff, at the time Defendants made these false representations, was not aware of the falsity of the Defendants' representations and believed them to be true.

685. In reliance upon Defendants' misrepresentations, Plaintiff provided Defendants with the funds necessary to complete the purchase of each of the above-referenced automobiles and subsequently refrained from taking legal action to obtain personal possession of the automobiles, which Plaintiff was made to believe were being held and insured by Defendants on Plaintiff's behalf.

686. As a result of Defendants' wrongful acts, Plaintiff has suffered and/or will continue to suffer significant pecuniary harm, which continues to accrue.

687. Defendants' conduct constitutes malicious, gross, wanton and willful wrongdoing as defined by the Courts of the State of New York, as Defendants fraudulently induced Plaintiff to transfer significant sums of money to Defendants on the false premise that the funds were to be used to purchase vintage automobiles on Plaintiff's behalf. *See* Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986).

688. Defendants' actions further constitute willfully or wantonly negligent conduct, as defined under New York Law. *See* Fordham-Coleman v. Nat'l Fuel Gas Distribution Corp., 42 A.D. 3d 106, 113, 834 NYS.2d 422, 428 (4th Dept. 2007).

689. Therefore, as a result of Defendants' aforementioned conduct and in light of the relevant New York State Laws, punitive damages are appropriate to punish Defendants and deter others from engaging in similar fraudulent misconduct.

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS,

SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for consequential damages, punitive damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

**COUNT V**
**(FRAUD)**
**(Against All Defendants)**

690. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 689 as though fully set forth herein at length.

691. Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their representations/communications to Plaintiff, Plaintiff's agents, and /or third-parties.

692. Each and every Defendant has personally engaged in this conduct, or knew or should have known that the other Defendants were engaged in it on his or her behalf. These false representations are detailed throughout this complaint, the email correspondences sent to Plaintiff and throughout the title and purchase documents the Defendants provided to Plaintiff.

693. Defendants made the aforementioned false representations with knowledge that their representations were materially false and/or their omissions were material.

694. Defendants further made the aforementioned misrepresentations and/or omissions with the intent of defrauding Plaintiff and obtaining access to Plaintiff's money and property.

695. The aforementioned material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Plaintiff by means of Plaintiff's transfer of large sums of money

and entrusting Defendants with safeguarding Plaintiff's vintage automobiles, pending their anticipated resale or importation to the United States for Plaintiff's personal use.

696. As a direct, proximate, and foreseeable result of Defendants' fraud, Plaintiff has been caused to suffer significant pecuniary, reputational, and other damages.

697. Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants. *See* Fordham-Coleman v. Nat'l Fuel Gas Distribution Corp., 42 A.D.3d 106, 113, 834 NYS.2d 422, 428 (4th Dept. 2007).

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for consequential damages, punitive damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

**COUNT VI**
**(TRESPASS TO CHATTELS)**
**(Against All Defendants)**

698. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 697 as though fully set forth herein at length.

699. As set forth above, the Defendants have engaged in a pattern of fraud, collusion, wrongdoing, and deceit with the intent to interfere with Plaintiff's property.

700. Through the aforementioned fraudulent actions, Defendants have intentionally, and without justification or consent, interfered and intermeddled with Plaintiff's right to the use and enjoyment of his property and funds that were intended for Plaintiff's personal pleasure and business.

701. Plaintiff has been harmed and the use of his property has been interfered with and disturbed when Plaintiff's property, resources and funds were necessarily redirected from their intended use and converted by Defendants for their own use and benefit.

702. The harms suffered by Plaintiff are the direct, proximate and reasonably foreseeable results of the Defendants' acts of intentional interference with Plaintiff's property and funds.

703. Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants. *See* Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986).

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for consequential damages, punitive damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

## COUNT VII
## (UNJUST ENRICHMENT)
## (Against All Defendants)

704. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 703 as though fully set forth herein at length.

705. As set forth above, the Defendants have retained the funds Plaintiff paid to purchase the aforementioned automobiles at issue in this matter and/or the automobiles themselves.

706. All of the funds and/or property Defendants obtained from Plaintiff were acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein.

707. Principles of equity and good conscience mandate that this Court prevent the Defendants from reaping the multi-million dollar windfall and any benefit arising out of the fraudulent acts of the Enterprise, as set forth herein.

708. Plaintiff has been harmed and has been deprived of the use of his funds and/or the enjoyment of his property, the automobiles, for which he paid valuable consideration. In addition, Defendants have deprived Plaintiff of the potential economic benefit he intended to receive as a result of contracted for transactions concerning the automobiles.

709. Rather, the Defendants have fraudulently retained the benefit of the above-referenced transactions and as a result have been unjustly enriched.

**WHEREFORE,** the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, for damages, costs, reasonable attorney fees, and any other relief the Court deems just and equitable.

## COUNT VIII
## (ACCOUNTING)
## (Against All Defendants)

710. Plaintiff repeats, realleges, and restates the allegations contained in paragraphs 1 through 709 as though fully set forth herein at length.

711. Plaintiff has and will continue to suffer injury as a direct result of Defendants' actions as set forth herein-above.

712. Plaintiff has no adequate remedy at law.

713. By reason of the foregoing, Plaintiff is entitled to an accounting from Defendants of all monies, gains, profits, and advantages derived from Defendants' several acts of racketeering in violation of 18 U.S.C. §§ 1962(c) and 1962(d) and from all other violations of applicable State, Federal and International law(s), including, but not limited to:

a. £93,126 payment made by Plaintiff to Defendants, SCHOLES and LEFT HAND, on or about October 16, 2014;

b. £97,250 payment allegedly made by Defendant, SPECIALIST CARS, on Plaintiff's behalf, to Defendant, SWEENEY, between July and November 2014;

c. £7,900 payment allegedly made by Defendant, SPECIALIST CARS, on Plaintiff's behalf, to Defendant, SWEENEY, between July and November 2014;

d. £2,000 payment allegedly made to Defendant, SMITH, on or about April 5, 2015;

e. £8,000 payment allegedly made to Defendant, SMITH, on or about April 5, 2015;

f. £9,500 payment allegedly made to Defendant, SMITH, on or about April 5, 2015;

g. £35,000 payment allegedly made to Defendant, SPECIALIST CARS, on or about April 3, 2014;

h. The two (2) payments of £10,000 allegedly made to Lorna Edwards, the wife of Defendant, EDWARDS, on or about April 4, 2014; and

i. The payment of $30,000.00 each to a “Noble Client Account” made at the instruction of Defendant, EDWARDS, on or about April 3, 2014.

**WHEREFORE**, the Plaintiff, Bernard Carl, prays that, after due proceedings, the Court render judgment against Defendants, EDWARDS, HAWKINS, SPECIALIST CARS, SCHOLES, LEFT HAND, HOWARTH, LIMBANI, WILLIAMS, SWEENEY, PATTINSON, LANDMARK CAR, HAMANN, SMITH, FOOS, DOE 1 and DOE 2, directing each Defendant to provide an accounting of all monies, gains, profits and advantages derived from the actions set forth in the foregoing paragraphs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, BERNARD CARL, respectfully requests that this Court:

A. Enter judgment on Counts I through VII of the Verified Complaint in favor of the Plaintiff, BERNARD CARL, in an amount to be determined at trial; and

B. Compensatory damages in the amount of no less than $8,003,935.50 or such amounts as the Court deems just and proper; and

C. Statutory penalties and damages in such amounts as the Court deems just and proper; and

D. On Plaintiff's CIVIL RICO claim, treble the damages Plaintiff has sustained as a result of Defendants’ conduct in the amount of no less than $24,011,806.50 pursuant to 18 U.S.C. § 1964(c); and

E. Punitive damages pursuant to applicable state law(s); and

F. As to Count VIII, order that all Defendants provide an accounting and be required to account for all gains, profits, and advantages derived from their several acts of racketeering

activity in violation of 18 U.S.C. §§ 1962(c) and 1962(d) and from all other violations of applicable State, Federal and International law(s); and

G. That the Court award Plaintiff costs and disbursements for this lawsuit, including reasonable attorneys' fees as permitted by law; and

H. Award such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

The Plaintiff, BERNARD CARL, hereby demands a trial by a jury on all issues so triable.

Dated: Newark, New Jersey
July 11, 2016

KRAVIS, FILE & WURGAFT, P.C.,
*Attorneys for Plaintiff*

Matthew A. Wurgaft, Esq. (MW1734)
201 Washington Street
Newark, New Jersey 07102
P: (973) 242 – 6220
F: (646) 878 – 9039
mwurgaft@kravisfile.com