**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BERNARD CARL,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS HAMANN,<br><br>Defendant. | Civil Action No. 16-CV-3863 (ADS)(AKT)<br><br>**AMENDED COMPLAINT** |

The Plaintiff, BERNARD CARL, by and through his attorneys, Silverberg P.C., as and for his amended complaint against Defendant THOMAS HAMANN, hereby alleges, as follows:

## JURISDICTION

1. Subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332, as Plaintiff Carl is a Florida resident, and Defendant Hamann resides in the Federal Republic of Germany, and the mount in controversy exclusive of interest and costs exceeds $75,000

2. Subject matter jurisdiction is also based on federal question, 28 U.S.C. § 1331, as Plaintiff Carl brings a claim under 18 U.S.C. § 1961 *et seq*., known as the RICO Act, against Defendant Hamann.

[INTENTIONALLY BLANK]

## INTRODUCTION AND OVERVIEW

***THE PARTIES***

3. At all times relevant to the claims asserted in this pleading, Plaintiff Bernard Carl was, and he remains, an individual with a residence at 216 Coopers Neck Lane, Southampton, New York and at 2340 Wyoming Avenue NW, Washington, DC. At the time of filing this Complaint, albeit not at the time the causes of action stated herein arose, Plaintiff Carl maintains his primary place of residence at 100 Worth Avenue, Palm Beach, Florida.

4. At all times herein mentioned, Defendant Thomas Hamann was and is a vintage car broker residing at 66 Knobloch Lane, Stamford, Connecticut.

5. Defendant Thomas Hamann has regularly conducted his vintage car brokerage business in the State of New York.

***THE CLAIMS***

**A. Defendants' Deceits Leading up to the Sept. 1 Wire**

6. In August 2015 Defendant Thomas Hamann was attempting to negotiate the acquisition of Plaintiff's Porsche motorcars with Edwards.

7. As the end of August 2015 approached, Defendant Thomas Hamann, aided and abetted by his attorney George Kramer, and acting in concert with Mr. Edwards, attempted to deceive both the proposed buyer of the Porsche motorcars, Defendant Thomas Hamann's client, Andreas Pohl, and the proposed seller, Plaintiff Carl, by creating false documents that showed each party that the other was ready to proceed with the transaction.

(a) Kramer's Email: A Lie to a Proposed Seller, <u>Plaintiff Carl, about a € 1.4 Million False Check</u>

8. On August 28, 2015, George Kramer, at Defendant Thomas Hamann's request, sent the following e-mail to Edwards:

> To whom it may concern: The undersigned attorney hereby confirms that he had received EUR 1.4 million to be held for Thomas Hamann toward the purchase of a Porsche Carrera 2.7 Touring and a Porsche Carrera 2.7RS Lightweight subject to Buyer's satisfactory inspection. Payment shall be made upon the conclusion of satisfactory Inspection of said cars. The price is ex their current location in the U.K. George Kramer Attorney-at-Law.

(Referred to below as the "Kramer email.")

9. Defendant Thomas Hamann knew this email was false because he later testified that he never had the $1.4 Euros; George Kramer knew the email was false because he never deposited the $1.4 million check from Defendant Thomas Hamann because Thomas Hamann told him to "hold the check" until he did get the funds.

10. Defendant Thomas Hamann admitted under oath that he "intended that this [the Kramer email] be a deception, that it be taken to mean that the funds were in fact in the trust account, when in fact there was no way the funds could come into the trust account until and unless they're received from a third party who had not yet agreed to put up the amount or committed himself to any purchased vehicle."

11. Defendant Thomas Hamann has admitted under oath that the intended target of the deception represented by the Kramer email was Plaintiff Carl, specifically admitting that "by

addressing it To Whom It May Concern, it was also intended to be presented to the owner [Plaintiff Carl] of the two cars."

12. Defendant Thomas Hamann knew or should have known that Edwards was going to use the Kramer email to deceive Plaintiff Carl. Defendant Hamann admitted under oath that Edwards said "all I hear from you since weeks is good words, good words, good words, but I have nothing to prove. I need to show Bernie [*i.e.*, Plaintiff Carl] something and can't you send a deposit. Can't you send a deposit, and then... I [Defendant Thomas Hamann] issued a [rubber] check."

(b) Defendant Thomas Hamann and Edwards' Email: A Lie to a Proposed Buyer, Mr. Pohl, about a False € 200,000 Deposit

13. Defendant's pattern of deception grew when, three days later, on August 31, 2015, Defendant Thomas Hamann received an email from Edwards that was to be forwarded to Defendant Thomas Hamann's client, the proposed buyer, Mr. Pohl, in a faithless scheme to deceive Mr. Pohl as well.

14. Defendant Thomas Hamann admitted under oath that the email prepared by Edwards contained materially false statements. "Bullshit" was the specific term Defendant Thomas Hamann used. Defendant Hamann admitted he was "to forward to [his client, Mr. Pohl]" the email falsely stating Edwards had known Defendant Hamann for over 20 years, that Edwards and Defendant Hamann had "done tens of millions of dollars of deals" together, when they had done "zero dollars of deals[.]"

15. At the same time, Mr. Edwards was pressing Defendant Thomas Hamann to move the sale of the two Porsches forward and "at least get the funds paid into your [Hamann's] escrow" to hold, being all or 50% of a deposit on purchase of the two cars.

16. In this context, on September 1, 2015 Defendant Thomas Hamann emailed the manager for Mr. Pohl. The email stated that "I [Defendant Thomas Hamann] will send [the owner of the cars, Plaintiff Carl] from my money today a deposit, a fully refundable deposit in the amount of 200,000 because I don't want to lose my faith and jeopardize a long business relationship and friendship."

17. Defendant Hamann testified that this email meant that he was going to get the money from elsewhere, money that would not be his personally, but that the $150,000 he was asking his wife Maria Hamann to wire to Ferrari Financial that very same day was completely different. This email was forwarded to Defendant Thomas Hamann's client with the misleading email of the day before from Edwards to Defendant Hamann that Defendant Hamann had testified was "bullshit."

18. At trial an earlier trial involving Defendant Thomas Hamann, Defendant Thomas Hamann asserted that his statement that he was sending 200,000 Euros to the owner [Plaintiff Carl] of the Porsche Touring and Porsche Lightweight "was not true. It was just my effort trying to push him [the buyer], as I was so pushed [by] Mr. Edwards I tried to push my client to move forward with the transaction."

19. Asked to confirm whether he was misleading the proposed buyer, his own client, Mr. Pohl, Defendant Thomas Hamann admitted "you may say so, yes, about the payment."

20. At the earlier trial Thomas Hamann also admitted under oath that it was true that "at that point Mr. Pohl through [his manager] Mr. Wolf was not ready to enter into any form of contract until the cars passed inspection."

21. Thus, as of September 1, 2015, Defendant Thomas Hamann had received from Mr. Pohl's manager only tentative expressions of interest in possible purchases of the two Porsches, but not enough interest for that buyer to commit to the purchase, to sign even a conditional purchase contract or to tender even a refundable good faith deposit.

### *B. DEFENDANT'S MISREPRESENTATIONS AND MISCONDUCT RESULT IN FURTHER LOSSES TO PLAINTIFF CARL*

22. Between August 1, 2015 and October 15, 2015 (the "Negotiation Period"), Plaintiff Carl believed his Porsche Touring and Porsche Lightweight were being held for his account by SCM, and was not made aware of the negotiations underway between Defendant Thomas Hamann and Edwards.

23. During the Negotiation Period and more specifically between mid-August and early October 2015, Plaintiff Carl made repeated demands upon Edwards and his associates, including SCM, for the return of several of his collector quality motorcars, including his Porsche Touring and Porsche Lightweight, to no avail.

24. At the beginning of the Negotiation Period, Edwards had secretly sold another of Plaintiff Carl's high-value vintage cars to a German dealer, by misrepresenting himself and then his proxy as the owners of the car, and diverted the sale proceeds to his own use and benefit.

25. On information and belief, Edwards was conspiring with Defendant Thomas Hamann, intending to repeat this previous fraud by also selling Plaintiff Carl's Porsche Touring

and Porsche Lightweight to Defendant Thomas Hamann's client, Mr. Pohl, without Plaintiff Carl's knowledge, in order to retain and divert the proceeds of that sale to his own use and benefit.

26. Edwards was prevented from implementing this abusive fraud by the issuance of a UK Court order on October 13, 2015 prohibiting the sale of Plaintiff Carl's Porsche Touring and Porsche Lightweight motorcars and requiring their return to Plaintiff Carl.

(i) The Kramer Email Was Foreseeably <u>Instrumental in Inflicting Further Losses on Plaintiff Carl</u>

27. Defendant Thomas Hamann has acknowledged that the Kramer email, as discussed earlier, was intended to mislead Plaintiff Carl and others into believing the falsehood that Kramer was holding €1.4 million in his attorney escrow account to complete an agreed purchase of Plaintiff Carl's Porsche Touring and Porsche Lightweight.

28. As Defendant Thomas Hamann has admitted, there is not "any reading of the [Kramer email] that could lead to any conclusion other than the fact that the monies [described therein] were in [Kramer's] control – not, in effect, [that a] check is probably in the mail" and "any reasonable person would interpret the [Kramer email as saying that Kramer] had 1.4 million euros to mean that it was good funds in Kramer's] trust account."

29. Defendant Thomas Hamann testified that he never had the 1.4 million euros referred to in the Kramer email; therefore, Defendant Thomas Hamann intentionally authorized and instructed the dispatch of the Kramer email when he knew it was false and misleading.

30. Defendant Thomas Hamann intentionally authorized and instructed the dispatch of the Kramer email knowing the substantive contents thereof were fraudulent.

31. In authorizing and instructing the dispatch of the false and misleading Kramer email, Defendant Thomas Hamann knew or should have known that the misrepresentations it contained could be used to Plaintiff Carl's detriment.

32. In dispatching the Kramer email when he did, Defendant George Kramer violated his professional obligations under Rule 4.1 of the Connecticut Rules of Professional Conduct prohibiting a member of the Bar of that State from "[making] a false statement of material fact or law to a third person" or from "[failing] to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client."

33. Edwards used the Kramer email to Plaintiff Carl's detriment, in two ways, with two audiences: with Bury Leasing Ltd. and with SCM.

(ii) Bury Leasing Ltd.

34. Unbeknown to Plaintiff Carl, between mid-July 2015 and October 12, 2015, Plaintiff Carl's Porsche Touring was actually being held by a UK lender, Bury Leasing Ltd. ("Bury"), as collateral for a loan taken out by an associate of Edwards based on misrepresentations as to its ownership.

35. Plaintiff Carl had no knowledge of this alleged loan until late in 2016.

36. On or about August 29, 2015, a copy of the false and misleading Kramer email was presented to Bury by an associate of Edwards, to serve as evidence of the impending sale of Plaintiff Carl's Porsche Touring.

37. At that time, the loan secured by Plaintiff Carl's Porsche Touring was seriously in default and Bury was threatening to liquidate its collateral, in other words to sell the Porsche Touring and use the funds to repay the loan.

38. As a direct result of its receipt of the false and misleading Kramer email, Bury chose to defer any such liquidation and to retain possession of Plaintiff Carl's Porsche Touring until mid-October 2015, making it impossible for SCM to respond to Plaintiff Carl's repeated demands for SCM to turn over possession of that car prior to October 12, 2015.

39. Had Bury sought to liquidate its collateral in early September 2015, it would have learned of the car's true ownership by Plaintiff Carl, which would have resulted in Plaintiff Carl recovering his Porsche Touring then, in September 2015.

40. Even if Bury did not learn of Plaintiff Carl's ownership in that way, its advertisement of the car for sale in September 2015 would have put Plaintiff Carl on notice as to the location of the car and allowed him to recover that car from Bury in September 2015.

(iii) Specialist Cars of Malton

41. On September 14, 2015, in response to Plaintiff Carl's repeated demands for the return of several of his cars, including his Porsche Touring, SCM advised Plaintiff Carl that it would not return his Porsche Touring because it had been in negotiation to sell that car.

42. On September 16, 2015, SCM reported to Plaintiff Carl that it had agreed to sell Plaintiff Carl's Porsche Touring for £570,000 – hence that car was no longer available to be returned to Plaintiff Carl.

43. On September 14, 2015, in response to Plaintiff Carl's repeated demands for the return of several of his cars, including his Porsche Lightweight, SCM also advised Plaintiff Carl that it would not return that car to Plaintiff Carl because SCM was already in negotiation to sell that car.

44. On September 16, 2015, SCM reported to Plaintiff Carl that it had agreed to sell Plaintiff Carl's Porsche Lightweight for £700,000 – hence that car was also no longer available to be returned to Plaintiff Carl.

45. SCM subsequently identified Edwards as the source of its early September 2015 understanding that a sale of Plaintiff Carl's Porsche Touring and Porsche Lightweight had been agreed.

46. On information and belief, the nearly contemporaneous Kramer email was the basis for Edwards's false representations to SCM that Plaintiff Carl's Porsche Touring and Porsche Lightweight had been sold, hence were no longer available for redelivery to Plaintiff Carl.

47. Plaintiff Carl's Porsche Touring was returned to SCM from Bury on or about October 12, 2015.

48. Relying on the alleged sales identified by Edwards, and over Plaintiff Carl's objections, SCM retained possession of Plaintiff Carl's Porsche Lightweight until October 12, 2015.

49. The October 13, 2015 court order Plaintiff Carl secured requiring SCM to return possession of Plaintiff Carl's Porsche Touring and Porsche Lightweight to Plaintiff Carl came too late because, by October 13, 2015, Edwards had removed Plaintiff Carl's Porsche Touring and Porsche Lightweight from SCM's premises and put them beyond Plaintiff Carl's reach.

(iv) The Proximate Effect of Defendant' Misrepresentations

50. Plaintiff Carl's efforts to recover his Porsche Touring and Porsche Lightweight were materially impeded by the false and misleading Kramer email.

51. Plaintiff Carl's efforts to recover his Porsche Touring and Porsche Lightweight were materially delayed by the false and misleading Kramer email, affording Edwards time to take possession of those vehicles and to put them beyond Plaintiff Carl's reach.

52. The false and misleading Kramer email was a proximate cause of and a substantial factor in Plaintiff Carl's loss of his Porsche Touring and Porsche Lightweight.

53. But for the false and misleading Kramer email Plaintiff Carl would not have suffered loss of his Porsche Touring and Porsche Lightweight.

54. Plaintiff Carl has still not recovered his Porsche Touring and Porsche Lightweight, although he has located both.

55. Even if Plaintiff Carl were ultimately successful in recovering either or both of his Porsche Touring and Porsche Lightweight, the false and misleading Kramer email was a proximate cause of and a substantial factor in Plaintiff Carl's loss of the use and benefit of those cars for more than two years and in the expenses he has incurred in trying to secure their return.

56. But for the false and misleading email Plaintiff Carl would not have suffered loss of the use and benefit of those cars for more than three years nor borne the expenses he has incurred in trying to secure their return.

57. The combined value of Plaintiff Carl's Porsche Touring and Porsche Lightweight is at least the €1.4 ($1.6) million price at which Defendant Thomas Hamann was seeking to acquire those cars.

## FIRST CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH, AND TRESPASS TO, CHATTELS AS AGAINST DEFENDANT THOMAS HAMANN

58. Paragraphs 1 through 57 of this complaint are re-alleged and incorporated by reference as if fully set forth herein.

59. The conduct of Defendant Thomas Hamann as alleged herein was intended to interfere with Plaintiff Carl's right to possession of the Porsche Touring and the Porsche Lightweight.

60. The conduct of Defendant described herein in fact interfered physically with Plaintiff Carl's right to possession of the Porsche Touring and the Porsche Lightweight.

61. The conduct of Defendant described herein proximately caused harm to Plaintiff Carl in his loss of possession of the Porsche Touring and the Porsche Lightweight.

62. Plaintiff Carl is entitled to recover as compensatory damages from Defendant Thomas Hamann, all losses within the range of probable contemplation of the Court or jury. Plaintiff Carl's damages are in excess of one million, six hundred thousand dollars ($1,600,000.00). Plaintiff Carl's damages include, but are not limited to, the value of Porsche Touring and the Porsche Lightweight, plus attorneys' fees expended and other litigation costs and recovery costs incurred in attempting to recover the Porsche Touring and the Porsche Lightweight, and all additional, incidental and consequential amounts as shall be determined prior to trial of the instant action and communicated to this Court at time of trial or at such other time as the Court may direct.

63. Therefore as a result of Defendant Thomas Hamann's aforementioned wrongful conduct, punitive and exemplary damages are appropriate to punish Defendant and deter others from engaging in similar fraudulent and, wanton wrongdoing.

## SECOND CAUSE OF ACTION
## RICO CLAIM AGAINST DEFENDANT THOMAS HAMANN

64. Paragraphs 1 through 63 of this complaint are re-alleged and incorporated by reference as if fully set forth herein.

65. Defendant, through the use of email, caused the fraudulent Kramer email to be sent to Edwards, who Hamann claims was acting as Carl's "agent."

66. Defendant, through the use of email, caused the fraudulent on September 1, 2015, email to Mr. Pohl's manager.

67. This constituted a pattern of conduct in violation of the use of a wire to communicate information in the furtherance of a scheme to defraud that interferes with interstate commerce ("Wire Fraud"). (18 USCS § 1343.)

68. This pattern of Wire Fraud represents predicate acts that violate the United States Racketeer Influenced and Corrupt Organizations Act ("RICO Statute"). (18 USCS § 1961 et seq.)

69. Upon information and belief, Hamann, through the use of wire and mail, communicated information in furtherance of a scheme to defraud that impacted interstate commerce and damaged Carl, which constitute further predicate acts under the RICO Statute.

70. Hamann is responsible for Carl's loss of property by way of the resulting loss of vehicles and other property losses due to Hamann's pattern of racketeering activity.

71. Carl is entitled to damages to be determined at trial, plus Carl's attorney fees and treble damages.

## RESERVED RIGHT TO AMEND

72. Plaintiff reserves the right to amend this Complaint prior to trial to seek recovery from additional parties, and to seek recovery for additional injuries Plaintiff may suffer, or to seek further remedies in equity, or to assert further common law and statutory theories of recovery.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

A. An award of exemplary and punitive damages against Defendant Thomas Hamann paid to Plaintiff as the Court may direct on the First Cause of Action;

B. All damages resulting from Hamann violating the RICO Statute and all remedies allowed for under the RICO Statute on the Second Cause of Action;

C. All additional remedies recognized in equity as the Court shall determine to be proper;

D. Costs of this action;

E. Attorneys' fees;

F. Pre-judgment and post-judgment interest, as provided by law; and

G. Such other, further and different relief as this Court deems necessary, just and proper.

**JURY DEMAND**

The Plaintiff, BERNARD CARL, hereby demands a trial by a jury on all issues so triable.

Dated: October 24, 2019
Central Islip, New York

Silverberg P.C.
*Attorneys for Plaintiff Bernard Carl*

By: _______/s/______________
Karl Silverberg, Esq.

320 Carleton Ave., Suite 6400
Central Islip, New York 11722
(631) 778-6077